No. 15-5100

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

*ANTHONY PISZEL,*

Plaintiff-Appellant,

v.

*THE UNITED STATES,*

Defendant-Appellee.

APPEAL FROM THE UNITED STATES
COURT OF FEDERAL CLAIMS
CASE NO. 1:14-CV-00691
JUDGE LYDIA KAY GRIGGSBY

**OPENING BRIEF OF PLAINTIFF-APPELLANT ANTHONY PISZEL**

William E. Donnelly, Esq.
MURPHY & McGONIGLE, P.C.
555 13th Street, N.W., Suite 410
Washington, D.C. 20004
(202) 661-7000

James K. Goldfarb, Esq.
Michael V. Rella, Esq.
MURPHY & McGONIGLE, P.C.
1185 Avenue of the Americas
21st Floor
New York, NY 10036
(212) 880-3999

*Attorneys for Plaintiff-Appellant
Anthony Piszel*

# <u>CERTIFICATE OF INTEREST</u>

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Appellant, Anthony Piszel, certifies the following:

1.      The full name of every party or *amicus* represented by me is: Anthony Piszel.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest):  Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are: Not applicable.

4.      The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:  James K. Goldfarb and Michael V. Rella of Murphy & McGonigle, P.C.

Dated:  August 18, 2015
Washington, D.C.

MURPHY & MCGONIGLE, P.C.


By:  /s/ William E. Donnelly
William E. Donnelly
*wdonnelly@mmlawus.com*
555 13th Street, N.W., Suite 410
Washington, D.C.  20004
(202) 661-7000

*Attorneys for Plaintiff-Appellant*
*Anthony Piszel*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ IV

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES..............................................................2

INTRODUCTION ..................................................................................3

STATEMENT OF THE CASE..................................................................9

    A. Mr. Piszel's Employment Before Freddie Mac...............................9

    B. Freddie Mac's Accounting Problems .............................................9

    C. Mr. Piszel's Employment Agreement With Freddie Mac............10

    D. Mr. Piszel's "Excellent Performance" At Freddie Mac ...............13

    E. The Government's Limited Regulatory Authority Under SASA..................14

    F. The Government's New And Expanded Authority To Prohibit "Golden Parachute Payments" Under HERA ...............................16

    G. The Government Places Freddie Mac Into Conservatorship And Directs Freddie Mac To Terminate Mr. Piszel Without Paying Any Of The Contractually-Required Termination Benefits ...............................21

    H. The Lower Court's Decision .........................................................24

SUMMARY OF ARGUMENT ..............................................................24

ARGUMENT .........................................................................................26

I.      THE STANDARD OF REVIEW IS *DE NOVO* ...........................26

II.      THE LOWER COURT ERRED IN DISMISSING MR. PISZEL'S TAKINGS CLAIM........................................................27

    A. Mr. Piszel Has A Cognizable Property Interest In His Contractual Termination Benefits ..................................................27

1. SASA Did Not "Expressly" Authorize The Government To Subsequently Review Or Prohibit Termination Benefits It Had Already Approved .....28

2. Mr. Piszel Was Not Required To Show That The Government "Could *Not* Later Change Its Mind After" Approving The Termination Benefits ....................................................................................................................31

3. The Government May Not Rely On HERA – Enacted Years *After* Mr. Piszel Acquired His Termination Benefits  – To Limit Mr. Piszel's Property Interest .......................................................................................33

4. The Cases On Which the Lower Court Relied Are Inapposite ...............37

B. Mr. Piszel Alleges a Regulatory Taking..........................................................41

C. Mr. Piszel Alleges a *Per Se* Taking ...............................................................43

D. Mr. Piszel Alleges a Categorical Taking.......................................................47

III.    THE LOWER COURT ERRED IN DISMISSING MR. PISZEL'S ILLEGAL EXACTION CLAIM ...................................................................49

A. The Government's Actions Constitute An Exaction ....................................49

B. The Government Contravened Its Statutory Power Under HERA ...............53

CONCLUSION ...........................................................................................................55

CERTIFICATE OF SERVICE ...................................................................................56

CERTIFICATE OF COMPLIANCE..........................................................................57

ADDENDUM .............................................................................................................58

# TABLE OF AUTHORITIES

## Cases

*A&D Auto Sales, Inc. v. U.S.*,
   48 F.3d 1142 (Fed. Cir. 2014) ................................................................33

*Aerolineas Argentinas v. U.S.*,
   77 F.3d 1564 (Fed. Cir. 1996) ...............................................................49

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
   339 F. Supp. 2d 52 (D.D.C. 2004) ............................................... 15, 31

*Brown v. Legal Found. of Wash.*,
   538 U.S. 216 (2003) ...............................................................................46

*Cal. Hous. Secs., Inc. v. U.S.*,
   959 F.2d 955 (Fed. Cir. 1992) ...............................................................37

*Chevron, U.S.A., Inc. v. Nat'l Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ...............................................................................31

*Cienega Gardens v. U.S.*,
   331 F.3d 1319 (Fed. Cir. 2003) ................................................... passim

*Clarke v. Office of Fed. Hous. Enter. Oversight*,
   355 F. Supp. 2d 56 (D.D.C. 2004) ............................................... 15, 30

*Concrete Pipe and Prod. of Cal., Inc.*
   *v. Construction Laborers Pension Trust for S.C.*,
   508 U.S. 602 (1993) ..................................................................... 39, 40

*Connolly v. Pension Benefit Guar. Corp.*,
   475 U.S. 211 (1986) ...............................................................................39

*E. Enterps. v. Apfel*,
   524 U.S. 498 (1998) ...............................................................................33

*Eastport S.S. Corp. v. U.S.*,
   372 F.2d 1002 (Cl. Ct. 1967) .................................................................50

*FDA v. Brown &. Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .......................................................................32

*Golden Pac. Bancorp v. U.S.*,
   15 F.3d 1066 (Fed. Cir. 1994) ........................................................37

*Hearts Bluff Game Ranch, Inc. v. U.S.*,
   669 F.3d 1326 (Fed. Cir. 2012) ......................................................38

*In re Griffith*,
   206 F.3d 1389 (11th Cir. 2000) ......................................................32

*Kam-Almaz v. U.S.*,
   682 F.3d 1364 (Fed. Cir. 2012) ......................................................26

*Killip v. Office of Pers. Mgmt.*,
   991 F.2d 1564 (Fed. Cir. 1993) ......................................................32

*La. Pub. Serv. Comm'n v. F.C.C.*,
   476 U.S. 355 (1986) .......................................................................32

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ................................................................. 43, 44

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1982) .............................................................. 47, 48

*Lynch v. U.S.*,
   292 U.S. 571 (1934) .......................................................................27

*Norman v. U.S.*,
   429 F.3d 1081 (Fed. Cir. 2005) ......................................................44

*Northern Transp. Co. v. Chicago*,
   99 U.S. 635 (1878) .........................................................................44

*Omnia Commercial Co. v. U.S.*,
   261 U.S. 502 (1923) .......................................................................27

*Penn Central Transp. Co. v. N.Y. City*,
   438 U.S. 104 (1978) ................................................................. 41, 43

*Perry Capital LLC v. Lew*,
No. 13-1025, 2014 WL 4829559 (D.D.C. Sept. 30, 2014) .................................38

*Starr Int'l Co. v. U.S.*,
106 Fed. Cl. 50 (2012)....................................................... 46, 47, 50, 52

*Starr Int'l Co. v. U.S.*,
121 Fed. Cl. 428 (2015)..................................................................26

*Tulare Lake Basin Water Storage Dist. v. U.S.*,
49 Fed. Cl. 313 (2001)................................................................ passim

*U.S. v. Pewee Coal Co.*,
341 U.S. 114 (1951) ......................................................................34

*U.S. v. Testan*,
424 U.S. 392 (1976) ......................................................................50

*U.S. v. White Mt. Apache Tribe*,
537 U.S. 465 (2003) ......................................................................50

*U.S. v. Winstar*,
518 U.S. 839 (1996) ......................................................................35

*United Nuclear Corp. v. U.S.*,
912 F.2d 1432 (Fed. Cir. 1990) ..........................................................43

**Statutes**

12 U.S.C. § 1452 (1992) ..................................................................15

12 U.S.C. § 1452(h)(2) (1992)............................................................29

12 U.S.C. § 4501 (1992) ..................................................................14

12 U.S.C. § 4511 (1992) ..................................................................14

12 U.S.C. § 4518 (2008). .................................................................18

12 U.S.C. § 4518(a) (1992)........................................................... 14, 28

12 U.S.C. § 4518(b) (2008) ...............................................................34

12 U.S.C. § 4518(e)(1) (2008) ............................................................18

12 U.S.C. § 4518(e)(2) (2008) ...................................................................19

12 U.S.C. § 4518(e)(4)(A) (2008) ............................................................18

12 U.S.C. § 4518(e)(4)(C)(ii) (2008) ......................................................19

12 U.S.C. § 4617(b)(2)(B)(iv) (2008) ......................................................53

12 U.S.C. § 4617(d)(3)(A) (2008) ...........................................................20

12 U.S.C. § 4619(a) (1992) ......................................................................14

28 U.S.C. § 1295(a)(3) (2012) ...................................................................1

28 U.S.C. § 1491(a) (1992) ........................................................................1

Fed. R. App. P. 4(a)(1)(B) ..........................................................................1

## Regulations

12 C.F.R. § 1231 (2008) ...........................................................................20

12 C.F.R. § 1231.2 (2008) .................................................................. 20, 21

12 C.F.R. § 1231.3(b)(2) (2008) ..............................................................20

12 C.F.R. § 1770.1 (2001) ................................................................. 15, 30

## Constitutional Provisions

U.S. Const. amend. V, cl. 4 .......................................................................27

## Other Authorities

154 Cong. Rec. S6097-08, S6112, 2008 WL 252063 (June 25, 2008) ...................17

154 Cong. Rec. S7436-01, S7439, 2008 WL 2856171 (July 25, 2008) ................17

154 Cong. Rec. S7436-01, S7448, 2008 WL 2856171 (July 25, 2008) ................16

154 Cong. Rec. S7436-01, S7454, 2008 WL 2856171 (July 25, 2008) ................17

66 Fed. Reg. 47550, 47553 (Sept. 12, 2001) .................................... 16, 30

Letter from Congressman Michael G. Oxley, Chairman of the Committee on
Financial Services to The Honorable Richard C. Chelvy, Chairman of the Senate
Banking Committee (September 14, 2006), *available at
https://www.alta.org/govt/issues/06/GSE-Letter-to-Shelby-Sarbanes-0913.pdf* .19

Richard S. Carnell, Improving the Regulation of Fannie Mae, Freddie Mac,
and the Federal Home Loan Banks:  Statement Before the U.S. Senate
Committee on Banking, Housing, and Urban Affairs at 2 (Feb. 10, 2004),
*http://www. banking.senate.gov/public/index.cfm?FuseAction=Files.
View&FileStore_id=386fbcae-4798-4aa2-ab91-f56702bd9a11* ........................17

## STATEMENT OF RELATED CASES

No appeals in or from the same civil action were previously before this Court or any other appellate court. The undersigned counsel is not aware of any pending cases in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Appellant Anthony Piszel sued the United States (together with its federal agencies, the "Government") claiming its actions constituted a taking of Mr. Piszel's contractual termination benefits in violation of the Fifth Amendment of the United States Constitution, or alternatively, an unlawful exaction in contravention of the Housing and Economic Recovery Act of 2008 (and its implementing regulations) and the Fifth Amendment of the Constitution. The United States Court of Federal Claims had jurisdiction below under 28 U.S.C. § 1491(a) (1992). On June 12, 2015, the Honorable Lydia Kay Griggsby issued a Memorandum Opinion and Order (the "Order") granting the Government's motion to dismiss. (Appendix ("A") 1-19). On June 16, 2015, final judgment was entered (A22, Dkt. No. 28), and Mr. Piszel filed a timely notice of appeal. (*Id.*, Dkt. No. 29); *see also* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(3) because the appeal is from a final decision of the Court of Federal Claims.

## **STATEMENT OF THE ISSUES**

The following issues are properly presented in this appeal:

1.     Whether the lower court erred in holding that Mr. Piszel did not allege a takings claim because he did not have a property interest or a reasonable investment-backed expectation in his termination benefits, where the Government previously reviewed and approved those benefits (and Mr. Piszel relied on that review and approval), and where the Government acknowledged that it had no statutory authority to re-review or prohibit termination benefits it had already approved?

2.     Whether the lower court erred in holding that Mr. Piszel did not allege a *per se* taking, where the Supreme Court has found *per se* takings when the Government has authorized the taking, as Mr. Piszel alleges here?

3.     Whether the lower court erred in holding that Mr. Piszel did not allege a categorical taking because he received certain restricted stock units that **vested before** he was terminated, where the plain language of Mr. Piszel's employment agreement provides that his termination benefits include **unvested** – not vested – restricted stock units, and Mr. Piszel alleges that he received none of his termination benefits as a result of the Government's actions?

4.     Whether the lower court erred in dismissing Mr. Piszel's unlawful exaction claim because he did not allege that he "paid any money to the

government directly or in effect", where Mr. Piszel alleges that he is entitled to damages pursuant to a money mandating statute, which the Supreme Court has recognized as an alternative theory for pleading unlawful exaction claims?

## **INTRODUCTION**

Mr. Piszel seeks redress for the Government's unconstitutional taking of contractual termination benefits that the Government agreed would be paid to him pursuant to his employment agreement with the Federal Home Loan Mortgage Corporation ("Freddie Mac").  That agreement provides that if Mr. Piszel were terminated "without cause" from his new position as Freddie Mac's Chief Financial Officer in the first four years of his employment, he "will" and "shall" receive the contractual termination benefits.  Mr. Piszel negotiated for those benefits in agreeing to leave his prior job, and more than $8 million in earned and accrued compensation, to join Freddie Mac.  Mr. Piszel would not have left that job and forfeited that compensation but for the Government's approval of the termination benefits.

Before Mr. Piszel signed his employment agreement with Freddie Mac, the Government reviewed and approved the termination benefits, as required by Freddie Mac's Charter Act.  The Government determined that the benefits were reasonable and comparable to benefits of other similarly-situated CFOs, and standard in executive employment agreements to induce an executive to leave a

stable position and forfeit substantial compensation.  At the time the Government approved Mr. Piszel's termination benefits, Freddie Mac was regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO"), pursuant to the Federal Housing Enterprise Financial Safety and Soundness Act of 1992 ("SASA").  The Government had **no** authority under the Charter Act or SASA – or any other statute – to re-review or prohibit termination benefits it had already approved.  Indeed, in a release adopting a final rule governing the regulation of termination benefits under SASA, OFHEO acknowledged it could not subsequently review or prohibit termination payments it had already approved.  Given that context, Mr. Piszel – as any reasonable person would – expected to receive the termination benefits that the Government told him he would receive.

Mr. Piszel's performance at Freddie Mac was exemplary.  He achieved the goals that Freddie Mac's Board and CEO established for him, and consistently received evaluations acknowledging that he was "an extraordinarily valuable addition to the team on a number of dimensions."  But nearly two years into Mr. Piszel's tenure, faced with the greatest financial crisis since the Great Depression, the Government placed Freddie Mac into conservatorship.  Despite Mr. Piszel's consistently strong performance, and without finding that Mr. Piszel played any role in the Government's decision to impose the conservatorship, the Government directed Freddie Mac to terminate Mr. Piszel "without cause".  It

further directed Freddie Mac not to pay to Mr. Piszel any of the termination benefits that the Government had agreed "will" and "shall" be paid to him upon termination.

In directing Freddie Mac to refuse to pay Mr. Piszel his termination benefits, the Government relied solely on new authority to prohibit "golden parachute" payments. That new authority was set forth in the Housing Economic Recovery Act of 2008 (together with its implementing regulations, "HERA"), financial crisis legislation enacted nearly two years **after** the Government reviewed and approved Mr. Piszel's termination benefits. Freddie Mac followed the Government's directive, terminated Mr. Piszel, and refused to pay him any termination benefits.

The Government's actions constituted a taking of Mr. Piszel's property in violation of the Fifth Amendment. In dismissing his takings claim, the lower court made at least three reversible errors.

First, the lower court erred in holding that Mr. Piszel did not have a property interest or a reasonable investment-backed expectation in his termination benefits. The lower court based that holding on two conclusions: (i) SASA "expressly" authorized OFHEO to re-review and prohibit Mr. Piszel's termination benefits after it had already approved them; and (ii) Mr. Piszel "point[ed] to no authority in [SASA] that could have guaranteed that **the government could not**

**later change its mind after OFHEO approved his compensation**."[1]  Those

conclusions were wrong as a matter of law.

Nothing in SASA or its implementing regulations authorized the

Government to change its mind once it reviewed and approved termination benefits

for GSE executive officers.[2]  In fact, SASA addressed compensation, generally.

The authority for reviewing and approving termination benefits, specifically, was

set forth in the GSEs' Charter Acts.  Nothing in the Charter Acts authorized the

Government to change its mind after it reviewed and approved termination

benefits.  OFHEO, the Government agency charged with that review and approval,

said as much in the release adopting a final rule on the subject:  "Upon determining

that an officer's termination benefits package, **as previously approved by**

**OFHEO**, has not changed in structure or terms, **such package will not be subject**

**to subsequent review or disapproval.**"

As for the lower court's conclusion that SASA does not prohibit the

Government from changing its mind, this Court's precedent makes clear that an

agency may act only pursuant to an **express** grant of power from Congress.  SASA

contains no express grant of power allowing the Government to re-review or

prohibit termination benefits it already approved, as the lower court itself tacitly

---

[1] Unless otherwise noted, internal quotation marks and citations are omitted, and emphasis is added.

[2] "GSE" stands for "government-sponsored enterprise", which include Freddie Mac and the Federal National Mortgage Association ("Fannie Mae").

acknowledged by pointing out that Congress provided that authority to OFHEO's successor, the FHFA, in legislation (HERA) enacted two years after Mr. Piszel executed his employment agreement. Mr. Piszel had a property interest and a reasonable investment-backed expectation in his termination benefits. (*See* Argument, Point II.A-B, below).

Second, the lower court erred in holding that Mr. Piszel failed to plead a *per se* takings claim. The sole basis for the lower court's holding was that "the **government** has neither physically occupied, nor taken title to, plaintiff's property." That was an incorrect statement of law because it assumed that *per se* takings require the Government **itself** to physically occupy **tangible** property. Under Supreme Court precedent, a *per se* taking also occurs when the Government authorizes someone else to perform the taking, as the Government did here when it directed Freddie Mac to prohibit Mr. Piszel from receiving his termination benefits. Further, the subject of a *per se* taking may be intangible property, like Mr. Piszel's termination benefits. Mr. Piszel pleaded a *per se* takings claim. (*See* Argument Point II.C, below).

Third, the lower court erred in holding that Mr. Piszel failed to plead a categorical takings claim. A categorical taking occurs when a plaintiff is deprived of "all economically beneficial or productive" use of his property. The lower court concluded that Mr. Piszel could not plead a categorical takings claim because his

termination benefits included restricted stock units and, before he was terminated, Mr. Piszel received certain restricted stock units. That conclusion ignores the employment agreement's plain language. The agreement provides that Mr. Piszel would receive a sign-on bonus in the form of restricted stock units that would vest over four years and that, upon termination other than for "cause", Mr. Piszel "shall" receive the unvested restricted stock units on that same schedule. Thus, the **vested** restricted stock units that Mr. Piszel received **before** he was terminated were not **termination** benefits; the **unvested** restricted stock units that he never received were. The Government completely deprived Mr. Piszel of his termination benefits, including all **unvested** restricted stock units. Mr. Piszel pleaded a categorical takings claim. (*See* Argument Point II.D, below).

Mr. Piszel pleaded in the alternative that the Government's actions constituted an unlawful exaction in contravention of HERA and the Fifth Amendment. The lower court dismissed that claim because Mr. Piszel failed to plead that he had paid any money to the Government directly or in effect. That ruling was in error. As the lower court recognized just two months ago, relying on the same Supreme Court precedent Mr. Piszel cited below, a plaintiff may plead an exaction claim not only by alleging that it paid money to the government, directly or in effect, but also by alleging that the Government exacted property pursuant to

a money mandating statute, such as HERA.  Mr. Piszel alleged precisely that.  (*See* Argument Point III.A, below).

For these reasons and those set forth below, the Court should reverse the lower court's dismissal of Mr. Piszel's Complaint.

## STATEMENT OF THE CASE

### A.    Mr. Piszel's Employment Before Freddie Mac

In August 2004, Mr. Piszel began working as the Executive Vice President and Chief Financial Officer of an SEC-reporting public healthcare company in California.  (A27 ¶ 14).  During Mr. Piszel's tenure, the company was the seventh fastest grower of earnings in 2005, and its stock price more than doubled.  (*Id.* ¶¶ 14-15).  Mr. Piszel was recognized in *Institutional Investor* as the CFO of the year in the healthcare sector for 2005.  (*Id.*).

### B.    Freddie Mac's Accounting Problems

Freddie Mac was on an entirely different track.  On November 21, 2003, it announced the results of its restatement of previously issued consolidated financial statements for the years 2000 through 2002.  (A 93 ¶ B.).  The effect of the restatement through December 31, 2002 was to change the company's net income by $5 billion, and change the company's regulatory core capital by $5.2 billion.  (*Id.*).  Freddie Mac's CEO and CFO resigned, and Freddie Mac committed

to ensuring the integrity of its financial reporting, returning to timely reporting, and completing a voluntary registration with the SEC.  (A28 ¶ 18).

## C.    Mr. Piszel's Employment Agreement With Freddie Mac

As of the fall of 2006, Freddie Mac still had not returned to timely reporting or registered with the SEC.  (*Id.* ¶ 19).  It began recruiting Mr. Piszel to become its CFO to achieve those goals and to restore financial reporting credibility to Freddie Mac.  (*Id.* ¶ 16).  By then, as noted, Mr. Piszel was an established CFO of a growing and respected healthcare company, where he had earned and accrued deferred compensation of $8.1 million, which consisted of (i) deferred compensation of 250,000 in-the-money stock options worth $5,625,000, and (ii) 37,500 shares of restricted stock units worth $1,725,000.  (*Id.*).  Based on his performance, he also expected to receive a 2006 end-of-the-year cash bonus of $750,000.  (*Id.*).

Freddie Mac learned about Mr. Piszel's earned and accrued deferred compensation, and anticipated bonus, during their negotiations.  (*Id.* ¶ 20).  Freddie Mac and its regulator, OFHEO,[3] acknowledged that Mr. Piszel's compensation was

---

[3] OFHEO was established by SASA to ensure the capital adequacy and financial safety and soundness of the GSEs.  In 2008, HERA combined OFHEO and another government agency to form the Federal Housing Finance Agency ("FHFA").  The FHFA is an independent regulatory agency that oversees Freddie Mac and Fannie Mae.  (A26 ¶ 11).

reasonable and comparable to the compensation of similarly situated CFOs at publicly traded companies listed on the New York Stock Exchange. (*Id.* ¶ 21).

To induce Mr. Piszel to leave his secure position and forgo his earned and accrued deferred compensation and anticipated bonus, Freddie Mac agreed to provide to Mr. Piszel certain contractual benefits if he were terminated "without cause" within the first four years of his employment at Freddie Mac. (*Id.* ¶ 22). Specifically, the "Termination of Employment Payment" clause in Mr. Piszel's employment agreement provides that if Freddie Mac terminates Mr. Piszel "without cause" in his first four years at Freddie Mac, "then you **will** receive a lump-sum cash payment equal to two-times your annualized base salary in effect at the time of termination." (A29 ¶ 23). Mr. Piszel's annual base salary was $650,000 the year he was terminated. (*Id.*).

The employment agreement also provides that Mr. Piszel would receive a sign-on bonus of $5 million in the form of Freddie Mac restricted stock units ("RSUs"). (*Id.* ¶ 24). The RSUs would vest over four years and "**shall** continue to vest pursuant to the vesting schedule set forth in the grant agreement" if Freddie Mac were to terminate Mr. Piszel in his first four years "for any reason other than 'Cause'". (*Id.*). The employment agreement also provides that Mr. Piszel would receive long-term performance-based incentive compensation in a combination of RSUs and stock options. (*Id.* ¶ 25). The target amount for this

incentive was $3 million, and Freddie Mac agreed that the long-term performance-based incentive granted in calendar year 2007 "will be no less than $3,000,000". (*Id.*).  In or about March 2007 and March 2008, Freddie Mac granted Mr. Piszel RSUs worth approximately $3 million each year that would vest in the future. (*Id.*).  These contractual benefits were intended to make Mr. Piszel whole for the earned and accrued deferred compensation, and anticipated 2006 year-end bonus, that he was forfeiting to join Freddie Mac.  (A28 ¶ 22).

Pursuant to Freddie Mac's Charter Act, James B. Lockhart III, acting in his capacity as OFHEO's Director, reviewed and approved the negotiated contractual terms that provided for the (i) termination payment, and (ii) further vesting of RSUs that were granted to Mr. Piszel as a signing bonus, each of which were payable upon Mr. Piszel's termination "without cause".  (A29 ¶ 26).  If Mr. Lockhart had not approved those terms, Mr. Piszel would not have left his former employer.  (A30 ¶ 27).  Nor would he have forfeited $8.1 million of earned and accrued deferred compensation, and the anticipated 2006 year-end bonus, to join Freddie Mac.  (*Id.*).  Freddie Mac and OFHEO recognized that the negotiated compensation and termination benefit terms were standard in executive employment agreements designed to induce an executive to leave a stable position and forfeit compensation earned at that position.  (*Id.* ¶ 28).

### D.    Mr. Piszel's "Excellent Performance" At Freddie Mac

Mr. Piszel had two goals when he joined Freddie Mac as its new CFO in November 2006:  return Freddie Mac to timely financial reporting and register Freddie Mac with the SEC.  (*Id.* ¶ 29).  He achieved both by mid-summer 2008. (*Id.* ¶ 30).  He also played a role in other significant improvements at Freddie Mac, including upgrading Freddie Mac's financial leadership team, hiring a new head of operations and systems, improving Freddie Mac's accounting policies, and remediating all of Freddie Mac's material weaknesses and most of the significant deficiencies identified by the company's outside auditors in early 2007.  (*Id.* ¶ 31).

In Mr. Piszel's 2007 review, Freddie Mac's CEO summed up Mr. Piszel's performance as follows:  "you have had an excellent performance year during a difficult and challenging period.  You have been an extraordinarily valuable addition to the team on a number of dimensions."  (A30 ¶ 32).   He commended Mr. Piszel's "decisive and courageous actions" and on returning the company to timely financial reporting.  (A31 ¶ 33).  He noted Mr. Piszel's "success in quickly developing a plan for SEC registration and beginning to execute that plan."  (*Id.*).  He described Mr. Piszel as a "strong leader" and thanked him for his "significant contributions in 2007, and [his] invaluable leadership as a member of" Freddie Mac's Executive team.  (*Id.* ¶ 34).  Mr. Piszel was considered the best performing executive on the Freddie Mac team in 2007, and his bonus as a

percentage of his base salary was the highest, as were his base salary increase and target bonus increase for 2008.  (*Id.* ¶ 35).

### E.    The Government's Limited Regulatory Authority Under SASA

At the time Mr. Piszel executed his employment agreement, Freddie Mac was regulated under SASA.  *See* 12 U.S.C. § 4501, *et seq.* (1992).  SASA established OFHEO as an independent agency within the Department of Housing and Urban Development to serve as the GSEs' regulator.  *See* 12 U.S.C. § 4511 (1992).  OFHEO's powers were limited.  For example, while SASA gave OFHEO the authority to place the GSEs into conservatorship, it could only do so in certain situations, each of which concerned the GSEs' facing significant financial difficulties, concealing or refusing to produce books and records to OFHEO, willfully violating a final cease-and-desist order issued by the Director, or agreeing to a conservatorship by a majority vote of the company's shareholders or the consent of its directors.  *See* 12 U.S.C. § 4619(a) (1992).

SASA also ostensibly gave OFHEO the power to regulate GSE executive "compensation".  But while OFHEO had the power to prohibit the payment of "excessive compensation" to GSE executives, it could do so only if the compensation was "not reasonable and comparable with compensation for employment in other similar businesses … involving similar duties and responsibilities."  12 U.S.C. § 4518(a) (1992).  In the two published decisions

addressing OFHEO's attempt to prohibit excessive compensation under Section 4518, OFHEO lost because it failed to make the required "not reasonable and comparable" finding.  *See generally Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004); *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52 (D.D.C. 2004).  Summing up SASA's limitations in a statement to Congress, the former Assistant Secretary for Financial Institutions for the U.S. Department of Treasury noted OFHEO's "significant structural weaknesses", and described it as a "small, hyper-specialized agency – with uncertain funding and overly narrow powers".[4]

Apart from SASA, the GSEs' Charter Acts required OFHEO to review and approve executive officer contracts for the payment of "termination" benefits.  *See* 12 U.S.C. § 1452 (1992).   But as with SASA, this authority was limited.  As OFHEO explained in a release adopting the final rule governing the exercise of its authority to regulate GSE executive compensation and termination benefits (*see* 12 C.F.R. § 1770.1 (2001)), as long as termination benefits were not modified, OFHEO could review and approve them only once – when the GSE and the executive entered into the contract providing for those benefits:

---

[4] Richard S. Carnell, Improving the Regulation of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks:  Statement Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs at 2 (Feb. 10, 2004), *http://www. banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=386fb cae-4798-4aa2-ab91-f56702bd9a11.*

> Upon determining that an officer's termination benefits package, **as previously approved by OFHEO**, has not changed in structure or terms, **such package will not be subject to subsequent review or disapproval.**

66 Fed. Reg. 47550-01, 47553 (Sept. 12, 2001). OFHEO exercised that one-time only authority when it reviewed and approved Mr. Piszel's termination benefits before he signed his employment agreement in 2006. (A29 ¶ 26).

### F.    The Government's New And Expanded Authority To Prohibit "Golden Parachute Payments" Under HERA

In 2008, faced with the worst financial crisis since the Great Depression, the Government acknowledged, and took steps to change, its limited regulatory powers under SASA. On July 24, 2008 – nearly two years **after** OFHEO reviewed and approved Mr. Piszel's termination benefits and Mr. Piszel executed his Freddie Mac employment agreement – Congress enacted HERA. Members of Congress described HERA as a "significant bill" and "one of the most significant pieces of legislation that we will address in this Congress and perhaps in many Congresses to come." 154 Cong. Rec. S7436-01, S7448, 2008 WL 2856171 (July 25, 2008). Such "significant" legislation was necessary because the Government had previously failed to regulate the GSEs under SASA:

> [T]here is a reason Fannie Mae and Freddie Mac spent over $200 million over the last 10 years on campaign contributions to those of us here in the House and the Senate, and they got something for it. They got left alone. They grew out of control. They grew into a big monster where now we say they are too big to fail.

16

154 Cong. Rec. S7436-01, S7454, 2008 WL 2856171 (July 25, 2008). Those

sentiments were echoed in a September 24, 2006 letter from the Chairman and

Ranking Member of the House of Representatives Committee on Financial

Services. The Chairman urged Congress not to "close without addressing the

serious inadequacies of the current GSE regulatory system."[5] Others noted the

"need to reform regulatory oversight", including "a stronger regulator of the

GSEs". 154 Cong. Rec. S7436-01, S7439, 2008 WL 2856171 (July 25, 2008); *see*

*also id*. at S7449 (HERA "creates a new, strong, independent, world-class

regulator" for the GSEs).

      HERA replaced OFHEO with the FHFA. But unlike OFHEO's

limited powers under SASA, the FHFA received new and significantly expanded

powers under HERA, comparable to "the powers which we have extended

historically to bank regulators." 154 Cong. Rec. S6097-08, S6112, 2008 WL

2520637 (June 25, 2008); *see also id.* ("we need to make sure [the GSEs] are well

capitalized and overseen by a strong and independent regulator with more bank-

like regulatory authorities"). One senator described the FHFA as having "broad,

new authorities to ensure the safe and sound operations of" the GSEs under HERA.

154 Cong. Rec. S6097-08, S6112, 2008 WL 252063 (June 25, 2008).

---

[5] *See* Letter from Congressman Michael G. Oxley, Chairman of the
Committee on Financial Services to The Honorable Richard C. Chelvy, Chairman
of the Senate Banking Committee (September 14, 2006),
*https://www.alta.org/govt/issues/06/GSE-Letter-to-Shelby-Sarbanes-0913.pdf*.

HERA significantly expanded the Government's ability to regulate GSE executive compensation. Addressing OFHEO's one-time only review and approval authority for termination benefits, HERA provided that the FHFA Director's approval of termination benefits under the GSEs' Charter Acts "shall not preclude the Director from making any subsequent determination" about whether the compensation is "reasonable and comparable with compensation for employment in other similar businesses … involving similar duties and responsibilities." 12 U.S.C. § 4518 (2008).

HERA also gave the FHFA new powers to "prohibit or limit, by regulation or order, any golden parachute payment or indemnification payment." 12 U.S.C. § 4518(e)(1) (2008). HERA defined "golden parachute payment" to include any payment "in the nature of compensation by any regulated entity for the benefit of any affiliated party pursuant to an obligation of such regulated entity that is contingent on the termination of such party's affiliation with the regulated entity; and is received on or after the date on which any conservator or receiver is appointed for such regulated entity". (A32 ¶ 40; 12 U.S.C. § 4518(e)(4)(A) (2008)).

The "golden parachute" provision also provided that the FHFA's Director "shall prescribe, by regulation, the factors to be considered by the Director in taking any action" to prohibit or limit "golden parachute payments".

18

(A32 ¶ 41; 12 U.S.C. § 4518(e)(2) (2008)).  The factors to be considered may include whether there is a reasonable basis to believe that the affiliated party (i) has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the regulated entity that has had a material effect on the financial condition of the regulated entity; (ii) is substantially responsible for the insolvency of the regulated entity, the appointment of a conservator or receiver for the regulated entity, or the troubled condition of the regulated entity; or (iii) has materially violated any applicable provision of federal or state law or regulation that has had a material effect on the financial condition of the regulated entity. (A32 ¶ 41; 12 U.S.C. § 4518(e)(2) (2008)).  Additional factors include whether the affiliated party was in a position of managerial or fiduciary responsibility, and the length of time that the party was affiliated with the regulated entity.  (A32 ¶ 41; 12 U.S.C. § 4518(e)(2) (2008)).

HERA excluded certain types of payments from the definition of "golden parachute payment", including "any payment made pursuant to a bona fide deferred compensation plan or arrangement which the Director determines, by regulation or order, to be permissible."  (A33 ¶ 42; 12 U.S.C. § 4518(e)(4)(C)(ii) (2008)).  Finally, HERA provided that when the Director disaffirms or repudiates any contract that was entered into before the conservatorship – such as Mr. Piszel's employment agreement – the person whose contract was repudiated is entitled to

recover "actual direct compensatory damages".  (A33 ¶ 43; 12 U.S.C.

§ 4617(d)(3)(A) (2008)).

On September 16, 2008, the FHFA's acting Director issued a

regulation to implement HERA's new "golden parachute" provision.  (A33 ¶ 44; 12

C.F.R. § 1231, *et seq.* (2008)).  The regulation provided that no regulated entity

shall make any "golden parachute" payment, the definition of which was materially

identical to the definition set forth in HERA's "golden parachute" provision.   (A33

¶ 45; 12 C.F.R. § 1231.2 (2008) ("golden parachute payment" definition)).  In

determining whether the FHFA's Director may permit "golden parachute"

payments, the regulation provided that the Director may consider:

  a.  whether, and to what degree, the entity-affiliated party was in a
      position of managerial or fiduciary responsibility;

  b.  the length of time the entity-affiliated party was affiliated with the
      regulated entity or the Office of Finance, and the degree to which the
      proposed payment represents a reasonable payment for services
      rendered over the period of employment; and

  c.  any other factor the Director determines relevant to the facts and
      circumstances surrounding the golden parachute payment, including
      any fraudulent act or omission, breach of fiduciary duty, violation of
      law, rule, regulation, order, or written agreement, and the level of
      willful misconduct, breach of fiduciary duty, and malfeasance on the
      part of the entity-affiliated party.

(A33-34 ¶ 46; 12 C.F.R. § 1231.3(b)(2) (2008)).  Like the statute itself, the

implementing regulation explicitly excluded from the definition of "golden

parachute payment" any payment made pursuant to a "bona fide deferred

compensation plan or arrangement which the Director determines, by regulation or order, to be permissible." (A33 ¶ 42; 12 C.F.R. § 1231.2 (2008) ("golden parachute payment" definition)).

### G. The Government Places Freddie Mac Into Conservatorship And Directs Freddie Mac To Terminate Mr. Piszel Without Paying Any Of The Contractually-Required Termination Benefits

On September 7, 2008, exercising its new and expanded authority under HERA, the Government placed Freddie Mac and Fannie Mae into conservatorship. (A34 ¶ 48). According to the FHFA, the conservatorship "was in response to a substantial deterioration in the housing markets that severely damaged Freddie Mac and Fannie Mae's financial condition and left them unable to fulfill their mission without government intervention." (*Id.* ¶ 49).

Two weeks after placing Freddie Mac into a conservatorship, Mr. Lockhart, acting in his capacity as FHFA's Director, sent a letter to Freddie Mac's CEO stating that he "determined that Anthony 'Buddy' Piszel should be terminated effective close of business today 'without cause.'" (A35 ¶ 52). Mr. Lockhart further "determined that providing Mr. Piszel with severance payments should not occur." (*Id.* ¶ 53). The letter made clear that the "directive specifically applies to any salary beyond the date of the cessation of Mr. Piszel's employment, any annual bonus for 2008 and any further vesting of stock grants." (*Id.*). The letter also made clear that the directive relied solely on HERA's new "golden parachute"

provision.  (A31 ¶ 36, A36 ¶ 54).  Specifically, Mr. Lockhart wrote that the

payments contemplated in Mr. Piszel's employment agreement "are golden

parachute payments within the meaning of 12 U.S.C. § 4518(e)(4) and its

implementing regulation and should not be paid to Mr. Piszel."  (A36 ¶ 54).

 Although it characterized Mr. Piszel's contractual benefits as "golden

parachute payments" and directed Freddie Mac not to pay them, the letter did not

reference any of the factors that HERA and its implementing regulation identified

as the factors to be considered by the Government in determining whether to

permit those payments.  (*See* A33-34 ¶ 46, A 35-36 ¶¶ 52-54).  Nor did Mr.

Lockhart explain why the Government was reversing its earlier determination

approving those payments.

 In fact, the factors set forth in HERA and its implementing regulations

support the Government's 2006 decision to approve Mr. Piszel's termination

benefits.  (A29 ¶ 26, A37 ¶ 61, A 38 ¶ 64).  No court, regulator, or government

agency had determined in 2008 (or since) that Mr. Piszel committed any

wrongdoing, breached any trust or fiduciary duty, or violated any law while at

Freddie Mac, or that Mr. Piszel was otherwise responsible – let alone

"substantially responsible" – for Freddie Mac's financial condition or the

conservatorship.  (A37 ¶ 62).  Indeed, the FHFA publicly acknowledged that it

"investigated but 'uncovered no evidence sufficient to demonstrate that any of

[Freddie Mac's] current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with [Freddie Mac's] acceptance and management of credit risk from 2004 through 2007.'" (A38 ¶ 63). As a result of those findings, the FHFA "moved to dismiss all claims against former Freddie Mac officers", including Mr. Piszel, "in [two] pending derivative actions, and the courts granted the motions to dismiss." (*Id.* ¶ 64).

Despite these undisputable facts, Freddie Mac followed Mr. Lockhart's directive, terminated Mr. Piszel, and refused to provide to him any of his termination benefits. (A36 ¶ 55). Before Mr. Piszel was terminated, 19,735 of the 78,940 RSUs that were granted to him as a sign-on bonus had vested, and Mr. Piszel received them. (*Id.* ¶ 56). After he was terminated, Mr. Piszel received no compensation for any of the unvested 59,205 RSUs that were contractually required to continue vesting under his employment agreement as termination benefits. (*Id.*). Freddie Mac also refused to pay Mr. Piszel his $1.3 million termination payment or the unvested portions of the long-term performance-based incentive compensation, to which he also was contractually entitled. (*Id.* ¶ 57). In short, Mr. Piszel received none of the termination benefits to which he was contractually entitled.

**H.    The Lower Court's Decision**

On August 1, 2014, Mr. Piszel timely commenced this action seeking just compensation for the Government's taking of his termination benefits.  (A35-37 ¶¶ 52-59, A38-39 ¶¶ 67-70, A40 ¶¶ 74-76).  In the alternative, Mr. Piszel sought compensation for the Government's illegal exaction of the same property interests in violation of the Government's constitutional, statutory, and regulatory authority.  (A37-38 ¶¶ 60-65, A39-40 ¶¶ 71-76).  On June 12, 2015, the lower court issued the Order granting the Government's motion to dismiss each of Mr. Piszel's claims.  (A1-19).

## SUMMARY OF ARGUMENT

The lower court erred in dismissing Mr. Piszel's takings claim.  It held that Mr. Piszel had neither a property interest nor a reasonable investment-backed expectation in the termination benefits that the Government had already approved.  But it acknowledged that Mr. Piszel's property interests and reasonable investment-backed expectations are informed by the statutory regime in place at the time he contracted with Freddie Mac.  Under that regime, the Government had no authority to subsequently review and prohibit termination benefits that OFHEO had already reviewed and approved.  OFHEO, Freddie Mac's regulator, said as much when it published the final rule on the subject four years before Mr. Piszel negotiated his employment agreement.  And Congress confirmed as much when it

enacted HERA in 2008 and amended SASA to authorize OFHEO's successor, the

FHFA, to subsequently review previously approved termination benefits.  The

lower court's conclusion that SASA did not expressly prohibit the Government

from re-reviewing and prohibiting termination benefits it had already approved

cannot be squared with that amendment, or this Court's precedent providing that

agencies may act only by grant of express authority from Congress.

      The lower court also erred in holding that Mr. Piszel had not pleaded a

*per se* takings claim.  The lower court stated that the Government "has neither

physically occupied, nor taken title to, plaintiff's property."  (A16).  But under

Supreme Court and other precedents, a plaintiff may – as Mr. Piszel did here –

plead a *per se* taking by alleging that the Government authorized another party

(here, Freddie Mac) to permanently occupy the plaintiff's contractual rights (here,

the termination benefits).

      The lower court also erred in holding that Mr. Piszel had not pleaded a

categorical takings claim.  The lower court reasoned that the Government did not

completely deprive Mr. Piszel of "all economically beneficial use" of his

termination benefits because, during his tenure at Freddie Mac, Mr. Piszel received

certain RSUs that vested before he was terminated.  But any RSUs that vested

before Mr. Piszel was terminated are not termination benefits under the plain

language of Mr. Piszel's employment agreement, and are not the subject of Mr.

Piszel's takings claim. Instead, Mr. Piszel alleges that the Government took all of his termination benefits, including unvested RSUs that were required to continue vesting after he was terminated.

Finally, the lower court erred in holding that Mr. Piszel did not plead an illegal exaction claim. The lower court reasoned that Mr. Piszel failed to allege that he paid any money to the Government "directly or in effect." But Mr. Piszel alleges that the Government exacted his termination benefits pursuant to a money mandating statute, an alternative means of pleading an exaction. The lower court recognized this alternative method of pleading an exaction this summer, relying on the same Supreme Court precedent on which Mr. Piszel relied in his brief below. *See Starr Int'l Co. v. U.S.*, 121 Fed. Cl. 428, 464 (2015) (citing *U.S. v. Testan*, 424 U.S. 392, 401-402 (1976)).

## ARGUMENT

## I.     THE STANDARD OF REVIEW IS *DE NOVO*

This Court reviews the lower court's grant of a motion to dismiss *de novo. See Kam-Almaz v. U.S.*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012).

## II.    THE LOWER COURT ERRED IN DISMISSING MR. PISZEL'S TAKINGS CLAIM

### A.    Mr. Piszel Has A Cognizable Property Interest In His Contractual Termination Benefits

The Fifth Amendment to the Constitution provides that private property may not be taken for public use without just compensation.  U.S. Const. amend. V, cl. 4.  Courts have recognized different types of actionable takings, but a threshold question for each type is whether the plaintiff "owned a distinct property interest at the time it was allegedly taken".  *Cienega Gardens v. U.S.*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).  Contracts can constitute a "distinct property interest" and be the subject of an unconstitutional taking.  *See Omnia Commercial Co. v. U.S.*, 261 U.S. 502, 510 (1923) ("If, under any power, a contract or other property is *taken* for public use, the government is liable"); *Lynch v. U.S.*, 292 U.S. 571, 579 (1934) ("Valid contracts are property" for Fifth Amendment taking purposes). Indeed, the lower court acknowledged as much, and correctly noted that "background principles derived from legislation enacted prior to the execution of a contract 'define the range of interests that qualify for protection as property under the Fifth' Amendment."  (A12, quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).  But the lower court held that Mr. Piszel did not have a "cognizable property interest" in his contractual termination benefits.  (A12).  That holding was based on two conclusions.  (*Id.*).

First, the lower court concluded that SASA, the legislation in place when Mr. Piszel executed his employment agreement, "expressly authorized federal regulators to prohibit [Mr. Piszel's] executive compensation if the government found the compensation to be unreasonable." (A14 (citing 12 U.S.C. § 4518(a) (1992)). The lower court did not dispute that the Government had already exercised that precise authority – the only authority it had under SASA to regulate "excessive" compensation – when it approved Mr. Piszel's termination benefits **after finding them reasonable and comparable**. (A14). Second, the lower court concluded that "**plaintiff** points to no authority in [SASA] that could have guaranteed that the government **could not later change its mind** after OFHEO approved [Mr. Piszel's] compensation." (A15.). Both conclusions are wrong as a matter of law.

### 1. SASA Did Not "Expressly" Authorize The Government To Subsequently Review Or Prohibit Termination Benefits It Had Already Approved

At the time Mr. Piszel executed his employment agreement, the Government had no authority – express or implied – to subsequently review and prohibit termination benefits that it had already approved. The SASA provision on which the lower court relied, 12 U.S.C. § 4518(a) (1992), addressed **compensation** generally, not **termination benefits** specifically. It limited the Government's authority to prohibit "compensation" "that is not reasonable and comparable with

compensation for employment in other similar businesses . . . involving similar duties and responsibilities." (A14). That is not the power the Government exercised here. (*See* Statement of the Case ("SOC") at 21-22, above (directive to Freddie Mac to not pay termination benefits to Mr. Piszel was based solely on HERA's golden parachute provision)). Rather, the Government re-reviewed and prohibited Mr. Piszel's **termination benefits** two years after it approved them. SASA authorized no such subsequent review, expressly or otherwise.

The authority to review and approve termination benefits is set forth in Freddie Mac's Charter Act, 12 U.S.C. § 1452(h)(2) (1992), not SASA. The Charter Act requires the Government to approve "**in advance**" any contractual termination benefits after finding them "comparable" to similar benefits. It did not authorize the Government to subsequently re-review and prohibit previously approved termination benefits. Thus, under the statutory scheme in place when Mr. Piszel contracted with the Government, the "range of interests that qualif[ied] for protection as property" included Mr. Piszel's right to not have his previously approved termination benefits subsequently reviewed and prohibited.

The Government can hardly contend otherwise. OFHEO, the agency charged with implementing SASA and the Charter Act, and regulating Freddie Mac, purposefully adopted the no-subsequent-review policy five years before it reviewed and approved Mr. Piszel's termination benefits. Specifically, in a 2001

release of the final rule for regulating executive compensation *and* termination

benefits under SASA and the Charter Acts (*see* 12 C.F.R. § 1770.1 (2001)),

OFHEO stated that it could not re-review and prohibit termination benefits it had

already approved:

> Upon determining that an officer's termination benefits package, **as previously approved by OFHEO,** has not changed in structure or terms, **such package will not be subject to subsequent review or disapproval.**

(66 Fed. Reg. 47550-01, 47553 (Sept. 12, 2001)).  As the release made clear,

OFHEO adopted the no-subsequent-review rule to address a concern raised by one

of the GSEs that the subsequent review of termination benefits "could result in

retroactive disapproval of previously awarded compensation, **creating**

**recruitment, retention, and constitutional issues**." *Id*.  The GSE's concern was

well-founded.  The Government's attempt here to disavow an agency's

interpretation of its own rule was not.

> The federal district court for the District of Columbia reached that

exact conclusion on materially identical facts.  *Clarke v. Office of Fed.  Hous.*

*Enter. Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004).  Clarke was Freddie Mac's

CFO before Mr. Piszel.  After he resigned, the Government prohibited him from

receiving contractual termination benefits that the Government had previously

approved.  *Id.* at 59-60.  The Government argued that it was authorized to re-

review and prohibit Clarke's termination benefits because "subsequent

information" showed the benefits were "excessive." *Id.* at 64. The court rejected that argument because, it held, OFHEO "concedes in its supplemental pleadings that it has previously indicated that section 1452(h) **has no retroactive application**". *Id.* at 64; *see also Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 57 (D.D.C. 2004) ("OFHEO was given the authority to approve termination packages *prior* to one of the enterprises entering into a compensation agreement.") (emphasis in original).

*Clarke* highlights the exact error in the lower court's reasoning and holding here. As OFHEO acknowledged, neither SASA nor the Charter Act authorized it to subsequently review and prohibit Mr. Piszel's termination benefits after it had already approved them. And the lower court was not at liberty to disregard OFHEO's "construction of a statutory scheme it is entrusted to administer". *Chevron, U.S.A., Inc. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) (reversing the lower court's rejection of an agency's interpretation of its own regulation).

> **2.    Mr. Piszel Was Not Required To Show That The Government "Could *Not* Later Change Its Mind After" Approving The Termination Benefits**

The lower court stood the law on its head when it tasked Mr. Piszel with showing "that the government could not later change its mind after OFHEO approved [Mr. Piszel's] compensation." (A14). As this Court has explained, "[a]n

agency is but a creature of statute" and "[a]ny and all authority pursuant to which an agency may act ultimately must be grounded in an **express** grant from Congress." *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) (collecting cases).[6] Here, Congress granted no authority – let alone expressly – for OFHEO to subsequently review and prohibit previously approved termination benefits. (*See* Argument Point I.A.1, above). It was not Mr. Piszel's burden – procedurally or substantively – to prove the negative.

Congress's own actions confirm that SASA did not expressly authorize the Government to do what it did here. As part of HERA, Congress amended Section 4518 to expressly provide that the Government's "approval of an agreement or contract pursuant to … section 1452(h)(2) of this title **shall not preclude the Director from making any subsequent determination**". 12 U.S.C. § 4518(b) (2008). The amendment would have been unnecessary if OFHEO already had that authority under SASA. *See In re Griffith*, 206 F.3d 1389, 1394

---

[6] The rule is a specific application of the general principle that "an administrative agency's power to regulate must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (holding that a federal agency exceeded its statutory authority because it acted without authority from Congress); *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act … unless and until Congress confers power upon it.").

(11th Cir. 2000) (en banc) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").[7]

> **3.      The Government May Not Rely On HERA – Enacted Years *After* Mr. Piszel Acquired His Termination Benefits  – To Limit Mr. Piszel's Property Interest**

The new powers that the Government acquired under HERA neither divested Mr. Piszel of his property interest in his termination benefits, nor salvage the lower court's decision.  As the lower court acknowledged, Mr. Piszel's property interests were defined by "background principles derived from legislation enacted **prior to**" his employment agreement.  (A12).  Applying that principle, courts routinely reject the Government's attempt to take property interests pursuant to **new** authority enacted **after** a plaintiff acquired its interests.  *See, e.g.*, *Cienega Gardens*, 331 F.3d at 1334 (finding a taking of contractual rights that were abrogated by **new** legislation that authorized the Government to modify those rights); *E. Enterps. v. Apfel*, 524 U.S. 498, 532 (1998) (finding a taking where a **new** regulation "attaches **new** legal consequences to [an employment relationship] completed before its enactment"); *A&D Auto Sales, Inc. v. U.S.*, 748 F.3d 1142, 1152-53 (Fed. Cir. 2014) (finding a taking, and holding that "[i]f a challenged restriction was enacted **after** the plaintiff's property interest was acquired, it

---

[7] The lower court all but acknowledged that SASA did not expressly authorize the Government's subsequent review when it observed that HERA modified SASA "**to make clear** that the FHFA could prohibit executive compensation **that had previously been approved**."  (A15).

cannot be said to 'inhere' in the plaintiff's title."); *U.S. v. Pewee Coal Co.*, 341

U.S. 114 (1951) (finding a taking where the **new** regulatory scheme permitting the

taking was enacted after the plaintiff obtained his property right).[8]  That principle

applies with equal force here.  The Government asserted newly acquired authority

under HERA to subsequently review and prohibit (that is, take) a property interest

that Mr. Piszel acquired two years earlier under a regulatory regime (SASA) that

did not authorize the Government to subsequently review and prohibit previously

approved termination benefits.

This Court's decision in *Cienega Gardens* is directly on point.  The

plaintiffs, real estate developers, received federally-subsidized mortgages from

private lenders to construct housing projects.  As authorized by the regulation in

place at the time, the mortgages permitted the plaintiffs to prepay their loans

without Government approval.  331 F.3d at 1325.  The Government reviewed and

approved the loan documents.  *Id.*  But the Government later enacted new

regulations requiring the plaintiffs to obtain Government approval before they

could prepay their loans.  *Id.* at 1326-27.  Defending against the plaintiffs' takings

claim, the Government argued that the plaintiffs had no property interest in their

contractual prepayment rights because they were "subject to, limited by, and totally

---

[8] *See also Tulare Lake Basin Water Storage Dist. v. U.S.*, 49 Fed. Cl. 313, 324 (2001) (finding a taking, and holding that "**subsequent** amendments to [the regulatory scheme] cannot, for contract purposes, be made retroactive").

dependent upon, the regulatory regime, including the power of the Government to change the prepayment rules expressly set forth in regulations reserving to [the Government] that authority". *Id.* at 1331.

The Court rejected the Government's argument that plaintiffs lacked a property interest because the housing program was subject to "pervasive Government control" (*id.* at 1330) – the identical argument that the Government raised below. (*See, e.g.*, A195 at 11-14). Relying on *U.S. v. Winstar*, 518 U.S. 839 (1996), the Court held that "the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking, because the contracts embodied the commitments of the contracting parties." *Cienega Gardens*, 331 F.3d at 1334. The Court concluded that "[t]o hold otherwise would mean that Congress could have changed the mortgage contracts in any way to affect any of the rights established by the contracts … and the Owners would be without remedy. **Again, this is not and cannot be the law.**" *Id.* at 1334. The Court also held that the plaintiffs' contracts "did not reserve to Congress the prerogative of modifying the [mortgages], mention any likelihood of Congress' doing so, allocate the risk of such changes to the Owners, or even mention [the Government's] reservation of the right to amend in its separate regulations." *Id.* at 1332. Finally, the Court observed that the prepayment rights were the "very enticement that the government used to draw the Owners into the

program", and the plaintiffs had no "reason to think that the prepayment right in their private contracts could be subject to seizure, much less seizure without compensation." *Id.* at 1333.

As with the *Cienega Gardens* contracts*,* Mr. Piszel's employment agreement did not give Congress the right to modify the contract, mention the likelihood of Congress doing so, or allocate the risk of modification to Mr. Piszel. And as with the *Cienega Gardens* prepayment provision, the termination benefits were the "very enticement" for Mr. Piszel's decision to join Freddie Mac.  (SOC at 12, above).  Indeed, as both the Government and Freddie Mac were aware, Mr. Piszel would not have left a stable job and forfeited more than $8 million in accrued and earned compensation without the termination benefits, which were designed to make Mr. Piszel whole for the compensation he was forfeiting.  (*Id.*). Accordingly, just as the Government in *Cienega Gardens* could not rely on new legislation to take a contractual right, the Government here may not rely on new legislation (HERA) to take Mr. Piszel's termination benefits.  If the law were otherwise, the Government could have changed Mr. Piszel's employment agreement in any way, at any time, to affect any of his contractual rights, and Mr. Piszel would be left with no remedy.  But **"this is not and cannot be the law."**  *Id.* at 1334.

### 4.    The Cases On Which the Lower Court Relied Are Inapposite

The cases cited by the lower court to hold that Mr. Piszel did not have a property interest in his termination benefits do not warrant that result here. In those cases, unlike this one, the Government relied on statutory authority that existed at the time the plaintiffs acquired their property interest to take plaintiffs' property. *Cal. Hous. Secs., Inc. v. U.S.*, 959 F.2d 955, 958 (Fed. Cir. 1992); *Golden Pac. Bancorp v. U.S.*, 15 F.3d 1066, 1074 (Fed. Cir. 1994). Specifically, although the plaintiffs in those cases claimed that the Government's act of imposing conservatorships and receiverships (and the Government's subsequent actions as conservator and receiver) constituted a taking, the Government already had the power to impose conservatorships and receiverships when the plaintiffs acquired their property interests. *Cal. Housing*, 959 F.2d at 957-958 (the bank understood when it entered the savings and loan business that under certain circumstances, "the federal government would take possession of its premises and holdings as conservator or receiver"); *Golden Pac.*, 15 F.3d at 1068, 1073-1074 (when Golden Pacific chose to invest in the bank, the regulatory scheme authorized the Government to impose a receivership). Thus, "[j]ust as [the bank] did not have the right to exclude the [receiver] in *California Housing Securities*, the Bank did not have the right to exclude the Comptroller" in *Golden Pacific*. *Golden Pac.*, 15 F.3d at 1074. "Indeed, Golden Pacific's expectations could only have been that the

[receiver] would exert control over the Bank's assets if the Comptroller … chose to place it in receivership." *Id.*[9]

In stark contrast to those cases, the Government here relied on **new** statutory authority to prohibit Mr. Piszel's termination benefits.  Specifically, the Government relied **solely** on HERA's golden parachute provision, which was enacted nearly two years **after** Mr. Piszel executed his contract.  (SOC at 21-22).  And pursuant to Freddie Mac's Charter Act, the Government had previously reviewed and approved Mr. Piszel's termination benefits, which further assured Mr. Piszel that he would receive those benefits.  (*Id.* at 12).  Thus, unlike the plaintiffs in the banking cases, neither Mr. Piszel nor any reasonable person would have expected in 2006 that the Government would later reverse its own decision in 2008, under new statutory authority, and take the benefits it already approved.[10]

---

[9] The other cases on which the lower court relied are distinguishable for the same reason.  *Perry Capital LLC v. Lew*, No. 13-1025, 2014 WL 4829559, at *20 (D.D.C. Sept. 30, 2014) (holding that imposing a conservatorship on the GSEs, which affected shareholders' rights to dividends and liquidation rights, was not a taking because "[s]ince 1992 … the GSEs have been subject to … the specter of conservatorship or receivership under which the regulatory agency succeeds to 'all rights' of the GSEs and shareholders"); *Hearts Bluff Game Ranch, Inc. v. U.S.*, 669 F.3d 1326, 1331 (Fed. Cir. 2012) (holding that the Government's precluding plaintiff from building a mitigation bank on his property was not a taking because the Government's authority preexisted plaintiff's property right).

[10] Moreover, unlike the banking cases, Mr. Piszel is not alleging a taking based on the imposition of a conservatorship or the Government's actions as conservator.  Indeed, the Government's limited authority under SASA to place Freddie Mac into conservatorship is a red-herring because, unlike the bank cases, it

The lower court's reliance on *Connolly* and *Concrete Pipe* is also misplaced. *See* A12-13, 17 (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986); *Concrete Pipe and Prod. of Cal., Inc. v. Construction Laborers Pension Trust for S.C.*, 508 U.S. 602 (1993)). In those cases, the plaintiffs alleged a taking based on Congress's enactment of a statute (the "MPAA") that increased liability for employers withdrawing from multi-employer pension plans. *See Connolly*, 475 U.S. at 217, 221; *Concrete Pipe*, 508 U.S. at 605. But, as in the banking cases, and unlike here, the Government's right to impose liability on withdrawing employers existed in the regulatory regime in place at the time the plaintiffs acquired their property interest. *See Concrete Pipe*, 508 U.S. at 646 (at the time plaintiff began contributing to the plan, "a withdrawing employer faced contingent liability up to 30% of its net worth" under ERISA); *Connolly*, 475 U.S. at 227 ("Pension plans [] were the objects of legislative concern long before the passage of ERISA in 1974", and it was clear that under certain conditions when a plan terminated, "employers who had contributed to a plan during the preceding five years were liable for their proportionate share of the plan's contributions during that period.").

To be sure, in citing *Connolly*, the lower court noted that the enactment of the MPAA merely "**buttressed**" the existing regulatory scheme.

---

is undisputed that the Government was **not** acting as conservator when it took Mr. Piszel's property; it was acting as "Freddie Mac's regulator." (A35 ¶ 52)

(A17 (quoting *Connolly*, 475 U.S. at 227); *see also Concrete Pipe*, 508 U.S. at 646 ("legislation "**readjusting** rights and burdens is not unlawful solely because it upsets otherwise settled expectations")).  But the same cannot be said of HERA. That statute can only be described as a sea change.  As Congressional members made clear in debating its enactment, HERA is "**one of the most significant pieces of legislation that we will address in this Congress and perhaps in many Congresses to come**", and it was necessary because **the Government had "overly narrow powers" under SASA and previously failed to regulate the GSEs**. (SOC at 15-16, above).  Indeed, Congress noted the "**serious inadequacies of the current GSE regulatory system**" under SASA, and therefore granted the Government "**powers which we have extended historically to bank regulators**" – powers the Government did **not** have under SASA.  (*Id.* at 17).  Among the powers Congress granted were the power to prohibit "golden parachute payments", including termination benefits (*id.* at 18-22), which the Government exercised in taking Mr. Piszel's benefits.  The Government has conceded that it lacked that same authority under SASA (*see* Point II.A.1, above).  Accordingly, HERA did far more than merely buttress or readjust SASA.

In short, neither the Government nor the lower court cited any case on all fours with the facts here – where the taking was pursuant to an entirely new statutory regime that granted the Government vastly expanded powers from those

it had when the property interest was acquired.  That the Government exercised the only power it had when Mr. Piszel acquired his property right and **approved** the benefits it took under a new regulatory regime enacted two years later further distinguishes the facts here from the cases cited by the lower court.  Accordingly, the lower court erred in holding that Mr. Piszel did not have a property interest in his termination benefits.

### B.    Mr. Piszel Alleges a Regulatory Taking

Because Mr. Piszel had a property interest in his termination benefits, it is necessary to analyze the type of taking that he has alleged, as courts apply different tests for different takings.  To begin, Mr. Piszel has alleged a regulatory taking.[11]

A "regulatory" taking occurs "when the government's regulation restricts the use to which an owner may put his property."  *Tulare Lake Basin Water Storage Dist. v. U.S.*, 49 Fed. Cl. 313, 318 (2001).  The Supreme Court has set forth three factors for determining whether a regulatory taking has occurred: (i) "the character of the [government] action", (ii) "the extent to which the [action] has interfered with distinct investment-backed expectations", and (iii) "the economic impact of the regulation on the claimant".  *Penn Cent. Transp. Co. v.*

---

[11] As discussed in Sections II.C-D, below, the Supreme Court has also prescribed two additional types of takings:  a "*per se*" or physical taking and a "categorical" taking, each of which Mr. Piszel also alleges in his Complaint.

*N.Y. City*, 438 U.S. 104, 124 (1978).  The Government only challenged – and the lower court only addressed – the second factor.[12]

In agreeing with the Government that Mr. Piszel "could not have a reasonable investment-backed expectation to receive his severance compensation" (A16), the lower court relied on the same reasoning – and same authority – on which it relied in holding that Mr. Piszel did not have a property interest in his termination benefits.  (*Compare* A12-15 *with* A16-17).  Consequently, the lower court erred on this issue for the same reasons as it erred in holding that Mr. Piszel did not have a property interest in those same benefits.  (*See* Point II.A, above).

Simply put, Mr. Piszel's "investment-backed expectations" were that he would receive the contractual benefits that the Government told him he would receive.  Indeed, if the Government did not approve his termination benefits, he "would not have left his stable position at his former employer, and he would not have forfeited $8.1 million in earned and accrued compensation, and anticipated bonus, to join Freddie Mac."  (A30 ¶ 27).  The lower court's decision overlooks that allegation, and essentially holds that Mr. Piszel did **not** expect to be made whole for the millions that he forfeited to join Freddie Mac.  Under that reasoning,

---

[12] To be clear, the lower court did not address Mr. Piszel's arguments on the other two factors, which Mr. Piszel incorporates herein.  (A104-105).  Instead, the lower court stated in a footnote that "it would appear that the economic impact of the government's actions are far outweighed by the absence of a reasonable investment-backed expectation that the plaintiff would receive this compensation." (A17 n.9).

on the first day of Mr. Piszel's employment with Freddie Mac, the Government could have ordered Freddie Mac to terminate Mr. Piszel without paying him any termination benefits, and Mr. Piszel would have no recourse. But **"this is not and cannot be the law."** *Cienega Gardens*, 331 F.3d at 1334, 1347 (finding reasonable investment-backed expectations where, like here, the plaintiffs "would not have entered into the agreements with HUD but for" the relevant contractual provision that the Government later abrogated under new authority); *see also E. Enterps.*, 524 U.S. at 532-34 (finding reasonable investment-backed expectations where a new statute operated "retroactively" to divest plaintiff of its contractual property interest); *United Nuclear Corp. v. U.S.*, 912 F.2d 1432, 1436 (Fed. Cir. 1990) (finding reasonable investment-backed expectations in mining rights where the plaintiff "had no indication or even suggestion that tribunal approval of the mining plan would be required before the Secretary would approve it.").

### C.    Mr. Piszel Alleges a *Per Se* Taking

A "*per se*" or "physical" taking occurs when the Government requires a property owner to suffer a permanent physical invasion of his property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); *Tulare Lake Basin Water Storage Dist. v. U.S.* , 49 Fed. Cl. 313, 318 (2001). Unlike "regulatory" takings, *per se* takings do not require balancing the three *Penn Central* factors. *See Tulare*, 49 Fed. Cl. at 318; *Loretto*, 458 U.S. at 438. *Per se*

takings require compensation "no matter how minute the intrusion, and no matter how weighty the public purpose behind it." (A8 (citing *Lucas*, 505 U.S. at 1015)).

In holding that Mr. Piszel has not alleged a *per se* taking, the lower court appeared to understand *per se* takings as limited to cases in which the **Government itself** physically occupies or takes title to a plaintiff's tangible property. (A16 (["[T]he **government** has neither physically occupied, nor taken title to, plaintiff's property."])). The lower court offered no further analysis, but relied on three cases that concerned an alleged taking of real property: *Loretto*, 458 U.S. at 421 (finding a taking where a cable company installed facilities on New York City apartment buildings); *Northern Transp. Co. v. Chicago*, 99 U.S. 635, 639 (1878) (alleging a taking where the Government denied plaintiffs access to their premises during construction); and *Norman v. U.S.*, 429 F.3d 1081, 1088 (Fed. Cir. 2005) (alleging a taking where a government permit allegedly required plaintiffs to transfer title to 220 acres of real property). To the extent the lower court held that a *per se* taking requires the Government itself to occupy or take title to plaintiff's property, and that the property be tangible, the court erred.

First, *Loretto* and *Tulare* demonstrate the Government itself does not have to occupy the property; a *per se* taking can occur when the Government merely **authorizes** the occupation. 458 U.S. at 421. In *Loretto*, the Supreme Court found a *per se* taking where a cable company installed its facilities on the roof of

apartment buildings pursuant to a statute.  *Id.*  The Government itself did not take title to or occupy plaintiff's property; instead, it authorized a third-party (the cable company) to occupy pursuant to legislation. In *Tulare*, subsequent legislation limited the plaintiff's contractual rights to certain volumes of water.  *Tulare*, 49 Fed. Cl. at 316.  The Government itself did not take the water; instead, it authorized the restrictions that deprived the plaintiff of its property rights.  *Id.*[13]

Mr. Piszel's *per se* takings claim stands on firmer ground than that in *Loretto* and *Tulare* because the Government did not merely authorize the taking of Mr. Piszel's property, it directed the taking.  Specifically, after imposing the conservatorship, the Government sent a letter to Freddie Mac stating that it had "determined" that Mr. Piszel should be terminated, and "determined that providing Mr. Piszel with severance payments should not occur."  (SOC at 21, above).  Freddie Mac followed the Government's "directive" and failed to pay Mr. Piszel *any* of the termination benefits to which he was contractually entitled.  (*See id*. at 23).  By authorizing or directing Freddie Mac to take title to or occupy Mr. Piszel's termination benefits, the Government engaged in a *per se* taking.

As for whether only intangible or real property may be the subject of a *per se* taking (A16, A147-148), courts consistently find *per se* takings when the

---

[13] Ironically, a parenthetical in the lower court's decision repeats a line from the Government's reply brief below in which the Government conceded that a *per se* taking can occur when the "Government has authorized physical occupation of" property.  (A16, A148).

Government takes a plaintiff's property interest in a contract, as the Government did here. *See, e.g.*, *Tulare*, 49 Fed. Cl. at 314, 320. The Supreme Court and other courts have also found a *per se* taking when the Government takes a plaintiff's interest in receiving money (or a money equivalent) linked to a specific property interest, as the Government also did here. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 217-218, 235 (2003) (finding a *per se* taking of monetary interest on lawyers' trust accounts: "the transfer of the interest seems . . . more akin to the occupation of a small amount of rooftop space in [*Loretto*], which was a physical taking subject to *per se* rules").

*Starr International*, in which the lower court permitted a takings claim based on a property interest in contracts, is instructive. *Starr Int'l Co. v. U.S.*, 106 Fed. Cl. 50 (2012). The plaintiff, a substantial shareholder in AIG, alleged that the Government caused AIG to forgo cash collateral it had posted to certain counterparties. *Id.* at 58-59, 75-76. On its motion to dismiss, the Government argued that once AIG posted the cash collateral, it no longer had a property interest in it. *Id.* at 75. The court rejected that argument. It held that the cash collateral was "more akin" to "a specific sum of money, derived from ownership of particular deposits in an established account." *Id.* at 75-76.

Like the funds that constituted a *per se* taking in *Brown* and AIG's cash collateral in *Starr*, Mr. Piszel alleges that his property interest in his

"termination payment constitutes a specific and separately identifiable sum of money that Mr. Piszel was entitled to receive if he were terminated 'without cause'". (A39 ¶ 68). Mr. Piszel's other contractual benefits – his sign-on bonus in the form of RSUs and long-term performance based compensation in the form of RSUs and stock options – likewise are specific funds (or fund equivalents) that are a specific, identifiable property interest. These termination benefits were included in Mr. Piszel's employment agreement to make him whole for the more than $8 million in earned and accrued compensation that he agreed to forgo to join Freddie Mac. (SOC at 12, above). Thus, like the cash collateral in *Starr*, Freddie Mac was merely holding Mr. Piszel's termination benefits (which had cash value) in "constructive accounts pending" Mr. Piszel's termination, and the cash was "comparable to the 'deposits in an established account'". *Starr*, 106 Fed. Cl. at 76. As *Starr* demonstrates, those allegations are the proper basis for a *per se* takings claim, and the Government's actions in "permanently excluding" Mr. Piszel from his termination benefits constitute a *per se* taking. (*See, e.g.,* A39 ¶ 70)

### D.    Mr. Piszel Alleges a Categorical Taking

A "categorical" taking occurs when governmental regulations completely deprive an owner of "all economically beneficial use" of his property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). The rule guards against regulation that "goes too far". *Id.* at 1014. Categorical, like *per se*, takings

do not require balancing the *Penn Central* factors. *See Tulare*, 49 Fed. Cl. at 318. In dismissing Mr. Piszel's categorical takings claim, the lower court held that Mr. Piszel was not deprived of "all economically beneficial" use of his property because he received certain shares of RSUs that **vested before** he was terminated. (A16). That ruling was in error.

As Mr. Piszel alleges, the Government applied HERA to "completely deprive[]" Mr. Piszel of "all economically beneficial use" of his **termination benefits**. *Lucas*, 505 U.S. at 1015-19; (*see* SOC at 23, above). Any RSUs (or other compensation) that **vested** or were otherwise paid to Mr. Piszel **before he was terminated** are not **termination benefits** under the employment agreement's plain language. Specifically, Mr. Piszel received a sign-on bonus in the form of RSUs that would vest over four years. (*Id.* at 11). When Mr. Piszel was terminated, 19,735 of those RSUs had already vested, and, therefore, fell outside the employment agreement's termination payment provision. (*Id.* at 23). That provision explicitly addresses **unvested** RSUs. It provides that if Mr. Piszel is terminated without cause, the **unvested** RSUs "**shall continue to vest**". (*Id.* at 11). Accordingly, only the **unvested** RSUs constituted part of Mr. Piszel's termination benefits. (*Id.*). Mr. Piszel alleges that he did not receive **any** of those **unvested** RSUs, or any other portion of his termination benefits. (*Id.* at 23). The Government should compensate Mr. Piszel for its categorical taking.

## III.   THE LOWER COURT ERRED IN DISMISSING MR. PISZEL'S ILLEGAL EXACTION CLAIM

As an alternative to Mr. Piszel's takings claim, Mr. Piszel alleges an illegal exaction claim.  "[A]n illegal exaction claim may be maintained when 'the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Aerolineas Argentinas v. U.S.*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. U.S.*, 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1007 (1967)). That is precisely the case here.  In violation of HERA, the Government effectively took (or exacted) Mr. Piszel's termination benefits and used that money to allow Freddie Mac – which was under Government conservatorship – "to continue fulfilling its Government-mandated mission".  (A36 ¶ 58).  The lower court's ruling to the contrary was in error.

### A.   The Government's Actions Constitute An Exaction

Whether the Government's action is an exaction of Mr. Piszel's termination benefits is a threshold question.  The lower court held it was not solely because it found that Mr. Piszel did not allege "he has paid any money to the government directly or 'in effect.'"  (A10).  But Mr. Piszel pleaded an exaction by an alternative method, which the lower court disregarded.  As Mr. Piszel explained

below, there are two types of illegal exactions, and only one requires that a

plaintiff has paid money to the Government directly or in effect.  (A123).  The

other allows a plaintiff to recover if he alleges that he is entitled to payment from

the Government for damages pursuant to a money mandating statute.  *See U.S. v.*

*Testan*, 424 U.S. 392, 400 (1976) (where the plaintiff is not seeking "the return of

money paid by them to the Government . . ., the asserted entitlement to money

damages depends upon whether any federal statute can '**fairly be interpreted** as

mandating compensation by the Federal Government for the damage sustained'");

*Starr* , 106 Fed. Cl.at  84 ("The Federal Circuit has indicated that an illegal

exaction claim requires a showing that the statute causing the exaction is **either**

**expressly or implicitly** money-mandating.").[14]  HERA is a money mandating

statute, whether by "necessary implication or otherwise".

A statute is money mandating if it can "fairly be interpreted as

mandating compensation by the Federal Government for the damage sustained"

and is "reasonably amendable to the reading that it mandates a right of recovery in

damages."  *U.S. v. White Mt. Apache Tribe*, 537 U.S. 465, 472-73 (2003) ("While

the premise to a Tucker Act claim will not be lightly inferred, a fair inference will

do.").  In *White Mountain*, the Supreme Court held that a statute requiring the

---

[14] *See also Eastport S.S. Corp. v. U.S.*, 372 F.2d 1002, 1007 (Cl. Ct. 1967) (noting that an exaction lies even when "no  . . . payment has been made[:]  the allegation must be that the particular provision of law relied upon grants the claimant, **expressly or by implication**, a right to be paid a certain sum").

Government to "maintain, protect, repair and preserve" property for an Indian tribe

created a fiduciary trust relationship, "and thus could fairly be interpreted as

mandating compensation through money damages if the Government faltered in its

responsibility." *Id.* at 474. HERA contains substantively identical language. *See*

12 U.S.C. § 4617(b)(2)(B)(iv) (2008) (while acting as conservator, the FHFA must

"preserve and conserve the assets and property of the regulated entity"). HERA

also provides that when the Director disaffirms or repudiates any pre-

conservatorship contract – such as Mr. Piszel's employment agreement – the

person whose contract was repudiated is entitled to recover "actual direct

compensatory damages". (A33 ¶ 43; 12 U.S.C. § 4617(d)(3)(A) (2008)). HERA is

therefore a money mandating statute that supports Mr. Piszel's illegal exaction

claim.

The lower court recently addressed this alternative manner of pleading

an illegal exaction claim in *Starr*. There, the plaintiff alleged that "[b]y taking 79.9

percent equity and voting control of AIG, the Government exacted the

shareholders' property interests." *Starr Int'l Co. v. U.S.*, 121 Fed. Cl. 428, 465

(2015). Stated another way, Starr did **not** allege that it paid anything to the

Government "directly or in effect"; instead, Starr alleged that certain of its rights

and share-value were diluted. *Id.* at 464. On the Government's motion to dismiss,

the court rejected as "premature" the Government's argument that the underlying statute was not money mandating.  *Starr*, 106 Fed. Cl. at 84.

Following a bench trial on the merits, the lower court held that the Government illegally exacted plaintiff's property interests.  *See Starr*, 121 Fed. Cl. at 464-466.  Addressing the "money mandating" exaction theory, the lower court observed that "some decisions have dispensed with the requirement for a money-mandating statute", while "[o]ther decisions have espoused a slightly tighter standard, but one that is still broader than simply requiring a 'money mandating' source of law." *Id.* at 464-465 (citing cases) (exaction claims may proceed where a statute, "either expressly or *by necessary implication*," provides that the remedy for its violation entails a return of money unlawfully exacted) (emphasis in original). The lower court concluded that, even under the more demanding "by necessary implication" standard, the Government exacted plaintiff's property, even though Starr did not pay any money to the Government directly or in effect.  *Id.* at 465 (the statute "does not contain express 'money mandating' language, but 'by necessary implication', the statute should be read to allow the shareholders' cause of action here.")  To hold otherwise, the lower court concluded, would have permitted the Government to "nationalize" AIG "without fear of any claims or reprisals".  *Id.*

*Starr* confirms that a plaintiff may plead, as Mr. Piszel has pleaded, an exaction claim pursuant to a money mandating statute, like HERA, even if the

plaintiff has not paid money to the Government "directly or in effect".  The lower court never addressed this alternative theory below, and therefore erred in dismissing Mr. Piszel's exaction claim.

### B.    The Government Contravened Its Statutory Power Under HERA

Because the Government exacted Mr. Piszel's termination benefits, it is necessary to consider whether the Government contravened its statutory authority.  Here, in exacting Mr. Piszel's termination benefits, the Government contravened its statutory authority under HERA in two ways.[15]  First, although HERA's "golden parachute provision" and its implementing regulations set forth factors for the FHFA Director to consider in determining whether termination benefits were a "golden parachute payment" that could be prohibited (*see* SOC at 18-20, above), the Director addressed none of those factors in its letter directing Freddie Mac to prohibit Mr. Piszel's termination benefits (*id.* at 22).  And the Government does not – and cannot – dispute that the factors heavily favor permitting Mr. Piszel's termination benefits.  (*Id.* at 22-23).

Second, HERA excludes from the definition of "golden parachute payment" payments to be "made pursuant to a bona fide deferred compensation plan or arrangement" that the Director determined by order to be "permissible".  (A40 ¶ 72; *see also* 12 U.S.C. § 4518(e)(4)(C)(ii) (2008); 12 C.F.R. § 1231.2

---

[15] The lower court did not reach this issue.

(2008) ("Golden parachute payment" definition")).  Mr. Piszel's termination benefits fit squarely into that exclusion.  They "were negotiated deferred compensation payments . . . that were intended to induce Mr. Piszel to leave his secure position as his former employer and to make him whole for the $8.1 million that he has earned and accrued there . . ., which he forfeited to join Freddie Mac." (A37 ¶ 61).  And the Government reviewed and approved the termination benefits pursuant to Freddie Mac's Charter Act.  (*See* SOC at 12, above).  Prohibiting the payment of those termination benefits was contrary to HERA.

In sum, because the Government contravened its statutory authority under HERA – a money mandating statute – in exacting Mr. Piszel's termination benefits, the lower court erred in dismissing Mr. Piszel's illegal exaction claim.

## CONCLUSION

For the foregoing reasons, Mr. Piszel respectfully requests that the Court reverse the lower court's Order and reinstate Mr. Piszel's takings and exaction claims.

Dated:  August 18, 2015  
            Washington, D.C.

Respectfully Submitted,

MURPHY & McGONIGLE, P.C.

By:  /s/ William E. Donnelly  
      William E. Donnelly  
      *wdonnelly@mmlawus.com*  
      555 13th Street, N.W., Suite 410  
      Washington, D.C.  20004  
      (202) 661-7000

      James K. Goldfarb  
      *jgoldfarb@mmlawus.com*  
      Michael V. Rella  
      *mrella@mmlawus.com*  
      1185 Avenue of the Americas  
      21st Floor  
      New York, New York  10036  
      (212) 880-3999

      *Attorneys for Plaintiff-Appellant*  
      *Anthony Piszel*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 18, 2015, I electronically filed with the Clerk's Office of the U.S. Court of Appeals for the Federal Circuit this opening brief of Anthony Piszel, and further certify that the parties' counsel will be notified of, and receive, this filing through the Notice of Docket Activity generated by this electronic filing.

/s/ William E. Donnelly

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rule of Appellate

Procedure, the undersigned attorney for Appellant certifies that this brief complies

with the type-volume limitation set forth in Rule 32(a)(7)(B) in that the word count

of the brief, as calculated by Microsoft Word, is 12,543 words, excluding the pa

/s/ William E. Donnelly

# **ADDENDUM**

# In the United States Court of Federal Claims

No. 14-691C
(Filed: June 12, 2015)

| | | |
|---|---|---|
| ANTHONY PISZEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Rule 12(b)(1); Subject-Matter |
| v. | ) | Jurisdiction; Rule 12(b)(6); Failure to |
| | ) | State a Claim; Fifth Amendment Takings; |
| THE UNITED STATES, | ) | Illegal Exaction. |
| | ) | |
| Defendant. | ) | |
| | ) | |

William E. Donnelly, Murphy & McGonigle, P.C., Washington, D.C., James K. Goldfarb, and Michael V. Rella, Murphy & McGonigle, P.C., New York, N.Y., Attorneys for Plaintiff.

David A. Harrington, Senior Trial Counsel, Franklin E. White, Jr., Assistant Director, Robert E. Kirschman, Jr., Director, Christopher C. Mizer, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., Attorneys for Defendant, and Michael Sitcov, Federal Housing Finance Agency, of Counsel, Washington, D.C.

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff, Anthony Piszel, brought this action alleging an illegal exaction and contract-based takings of his severance compensation under an employment agreement with the Federal Home Loan Mortgage Corporation, in violation of the Fifth Amendment of the United States Constitution.  The government has moved to dismiss plaintiff's claims for lack of subject-matter jurisdiction and for failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  For the reasons set forth below, the government's motion to dismiss is **GRANTED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

Plaintiff, Anthony Piszel, is the former Chief Financial Officer of the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Compl. at ¶ 1.  Prior to joining Freddie Mac in 2006, plaintiff accrued $8.1 million in unpaid compensation from his former employer.  *Id.* at ¶¶ 2, 16.  As an incentive to join Freddie Mac and to forego this compensation, Freddie Mac offered to provide plaintiff with certain employment benefits if he were to be terminated from his job without cause during the first four years of his employment.  *Id.* at ¶ 4, 22-25.  Specifically, plaintiff's employment agreement provided that, should he be terminated without cause, plaintiff would receive a lump sum cash payment and certain restricted stock units awarded to plaintiff would be allowed to continue to vest.  *Id.*

Freddie Mac is a government-sponsored enterprise ("GSE").  *See* 12 U.S.C. §§ 1451-1459 (2008).  In 1992, Congress established the Office of Federal Housing Enterprise Oversight ("OFHEO") to regulate Freddie Mac, pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 ("Safety and Soundness Act").  Compl. at ¶ 11.  Since that time, Freddie Mac has been subject to regulatory oversight and the potential for conservatorship.  *See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102–550, §§ 1301–95, 106 Stat. 3672, 3941–4012; 12 U.S.C. § 4617(b) (1992) (establishing OFHEO).  OFHEO, acting in its capacity as the regulatory agency for Freddie Mac, reviewed and approved plaintiff's employment agreement in 2006.  Compl. at ¶¶ 5, 21.

In response to great economic turmoil within the national housing market, Congress enacted the Housing and Economic Recovery Act ("HERA") on July 30, 2008, to provide for greater regulatory authority over the housing sector.  *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654; 42 U.S.C. § 4501 *et seq.*  HERA, among other things, replaced OFHEO with the newly created Federal Housing Finance Agency ("FHFA").

---

[1] The facts recounted in this Memorandum Opinion and Order are taken from the plaintiff's complaint cited in this Memorandum Opinion and Order as ("Compl. at ___"), the defendant's motion to dismiss ("Def. Mot. at __"), plaintiff's opposition to the motion to dismiss ("Pl. Opp. at __"), and defendant's reply ("Def. Rep. at __").  For the purpose of this Memorandum Opinion and Order, the Court accepts all undisputed facts in the plaintiff's complaint as true.

Compl. at ¶ 36.  HERA also gave the Director of FHFA expanded authority to prohibit or limit any golden parachute or indemnification payment to senior executives who were employed by Freddie Mac and expanded the government's authority to place Freddie Mac into conservatorship.  Compl. at ¶¶ 38-39; *see also* 12 U.S.C. § 4518(e)(l).

With these new authorities in hand, the FHFA placed Freddie Mac into conservatorship on September 7, 2008.  Compl. at ¶ 7.  The following week, the Director of FHFA promulgated regulations setting forth the factors to be taken into account when seeking to limit or prohibit golden parachute payments under employment agreements with Freddie Mac. Compl. at ¶¶ 41, 44; *see also* 12 C.F.R. § 1231.5.

On September 28, 2008, the Director of FHFA instructed Freddie Mac to terminate plaintiff without cause and to withhold plaintiff's severance compensation.  Compl. at ¶¶ 52-54.  Freddie Mac complied with this directive.  *Id*. at ¶ 55.  At the time of his termination, plaintiff received 19,735 of the 78,940 restricted stocks units granted under his employment agreement.  *Id*. at ¶ 56.  Plaintiff has not received the remainder of severance compensation called for under his employment agreement.  *Id*. at ¶¶ 8, 55-57.

### B.    Procedural Background

On August 1, 2014, plaintiff commenced this action alleging an unconstitutional takings without just compensation of his property rights under his employment agreement with Freddie Mac, in violation of the Fifth Amendment.  *Id*. at ¶ 69.  Alternatively, plaintiff alleges that the government illegally exacted his property rights in violation of HERA and the Due Process Clause of the Fifth Amendment.  *Id.* at ¶ 71.

On November 25, 2014, the government moved to dismiss plaintiff's complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(1) and 12(b)(6).  *See generally* Def. Mot.  On January 30, 2015, plaintiff filed his opposition to defendant's motion to dismiss.  *See generally* Pl. Opp.  The

government filed its reply brief on March 10, 2015.  *See generally* Def. Rep.  The Court held oral argument on the government's motion on June 2, 2015.[2]

## III.    LEGAL STANDARDS

### A.    Jurisdiction and RCFC 12(b)(1)

The United States Court of Federal Claims is a court of limited jurisdiction and the Court "possess[es] only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Under the Tucker Act, the Court has limited jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2011).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . the Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead a claim founded upon an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages.  *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . .").  Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government . . . ."  *Testan*, 424 U.S. at 400 (internal citation omitted).

When deciding a motion to dismiss based upon a lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the

---

[2] References to the transcript from the oral argument held on June 2, 2015 are cited as ("Tr. at __").

complaint are true and must draw all reasonable inferences in the non-movant's favor.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, plaintiff bears the burden of establishing subject-matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998), and he must do so by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted).  Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

### B.  Rule 12(b)(6)

When deciding a motion to dismiss based upon a failure to state a claim pursuant to RCFC 12(b)(6), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor.  *See Erickson*, 551 U.S. at 94.  And so, to survive a motion to dismiss under RCFC 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In *ABB Turbo Systems AG v. TurboUSA, Inc.*, the Federal Circuit explained the interplay between RCFC 8(a)(2) and RCFC 12(b)(6), which "together establish a notice-pleading standard that is applied, in a context-specific manner, with the recognition that the imposition of litigation costs must be justified at the threshold by the presence of factual allegations making relief under the governing law plausible, not merely speculative."  774 F.3d 979, 984 (Fed. Cir. 2014).  RCFC 8(a)(2) requires that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the complaint provides fair notice of the nature of claim and the grounds upon which it rests.  RCFC 8(a)(2); *see also Twombly*, 550 U.S. at 555.  Where the complaint fails to "'state a claim to relief that is plausible on its face,'" the Court must dismiss the complaint.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  On the other hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity," and determine whether it is plausible, based on these facts, to find against the defendant.  *Iqbal*, 556 U.S. at 664, 678-79 ("A claim has facial plausibility when the . . . plead[ed] factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

## C. Illegal Exaction and Fifth Amendment Takings

### 1. Illegal Exaction

This Court has recognized that an illegal exaction occurs when a "'plaintiff has paid money over to the [g]overnment, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). And so, to assert a valid illegal exaction claim, a plaintiff must show that: (1) money was taken by the government and (2) the exaction violated a provision of the Constitution, a statute, or a regulation. *Andres v. United States*, No. 03-2654, 2005 WL 6112616, at *2 (July 28, 2005). The Federal Circuit has recognized that "the Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas*, 77 F.3d at 1573. This Court recognizes that an illegal exaction occurs when "the Government has the citizen's money in its pocket." *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954). In such circumstances, an action can be maintained under the Tucker Act to recover the money exacted. *Aerolineas*, 77 F.3d at 1573.

### 2. Fifth Amendment Takings

The Takings Clause of the Fifth Amendment guarantees just compensation whenever private property is "taken" for public use. U.S. Const. amend. V. The purpose of the Fifth Amendment is to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *see also Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994).

In order to have a cause of action for a Fifth Amendment takings, the plaintiff must point to a protectable property interest that is asserted to be the subject of the takings. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted). Contract rights can be the subject of a takings action. *See, e.g.*, *Lynch v.*

*United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); *see also United States v. Petty Motor Co.*, 327 U.S. 372, 380-81 (1946) (holding that plaintiff was entitled to compensation for government's takings of option to renew a lease).

Courts have traditionally divided their analysis of Fifth Amendment takings into two categories−regulatory takings and physical takings. The United States Court of Appeals for the Federal Circuit has recognized that "[g]overnment action that does not directly appropriate or invade, physically destroy, or oust an owner from property but is overly burdensome may be a regulatory taking." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1151 (Fed. Cir. 2014). In assessing whether a regulatory takings has occurred, courts generally employ the balancing test set forth in *Penn Central*, weighing the character of the government action, the economic impact of that action and the reasonableness of the property owner's investment-backed expectations. *Penn Central Transp. Co.*, 438 U.S. at 124-25. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (regulation is a takings if it is "so onerous that its effect is tantamount to a direct appropriation or ouster").

Regulations that are found to be too restrictive, so that the regulations deprive property of its entire economically beneficial or productive use, are viewed as categorical takings. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *see also A & D Auto Sales*, 748 F.3d at 1151-52. Categorical takings do not require the application of the *Penn Central* balancing test. *Id.* at 1152. The Supreme Court has mainly applied the categorical test to regulatory takings of real property. *See Lucas*, 505 U.S. at 1015−19. In *A & D Auto Sales*, the United States Court of Appeals for the Federal Circuit noted that it has at times applied the categorical test to tangible personal property as well. 748 F.3d at 1151-52 (citing *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196−98 (Fed. Cir. 2004)); *see also Maritrans, Inc. v. United States*, 342 F.3d 1344, 1353−55 (Fed. Cir. 2003).[3]

---

[3] The United States Court of Appeals for the Federal Circuit has not yet addressed the question of whether the categorical takings test may apply to takings of intangible property, such as contract rights. *See A & D Auto Sales*, 748 F.3d at 1152.

In contrast, physical or *per se* takings occur when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of "a practical ouster of [the property owner's] possession." *Transportation Company v. Chicago*, 99 U.S. 635, 642 (1878); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). When an owner has suffered a physical invasion of his property, the Supreme Court has noted that "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Lucas*, 505 U.S. at 1015. The distinction between a physical invasion and a governmental activity that merely impairs the use of that property turns on whether the intrusion is "so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it." *United States v. Causby*, 328 U.S. 256, 265 (1946).

## IV. DISCUSSION

### A. Plaintiff Fails to State a Plausible Illegal Exaction Claim

In the complaint, plaintiff alleges that the government illegally exacted the severance compensation in his employment agreement when the FHFA terminated his employment. Compl. at ¶¶ 60-65. The government argues that the Court should dismiss this claim for three reasons: (1) the government has not exacted any money from plaintiff; (2) plaintiff's claim is precluded because his breach of contract claim against Freddie Mac has lapsed;[4] and (3) plaintiff asserts an Administrative Procedure Act claim to review the FHFA's termination decision, which falls outside the jurisdiction of this Court. Def. Mot. at 6-10. For the reasons discussed below, dismissal of plaintiff's illegal exaction claim is appropriate.

It is well-established that this Court lacks jurisdiction to consider claims brought pursuant to the Administrative Procedure Act ("APA"). *Lawrence v. United States*, 69 Fed. Cl. 550, 554 (2006). The Court does not, however, construe plaintiff's claim as a claim seeking judicial review under the APA. In his complaint, plaintiff alleges that the FHFA unlawfully exacted his

---

[4] While the Court finds that plaintiff fails to state a plausible illegal exaction claim, the Court does not agree with the government's argument that this claim is precluded because plaintiff allowed a potential breach of contract claim against Freddie Mac to lapse. *See* Def. Mot at 8-9. The government cites to no legal authority for this novel proposition. Moreover, plaintiff can certainly pursue alternative legal remedies regarding the termination of his employment agreement.

rights to severance compensation under his employment agreement. *Id.* The Court has long exercised jurisdiction over illegal exaction claims. *See, e.g.*, *Aerolineas*, 77 F.3d at 1572-73 (citing *Eastport S.S. Corp.*, 372 F.2d at 1007). And so, it is appropriate for the Court to examine whether plaintiff's complaint states a plausible illegal exaction claim. RCFC 12(b)(6).

A plain reading of the complaint shows that plaintiff fails to state a plausible illegal exaction claim. An illegal exaction occurs where a "'plaintiff has paid money over to the [g]overnment, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Aerolineas*, 77 F.3d at 1572-73 (quoting *Eastport S.S. Corp.*, 372 F.2d at 1007). And so, to assert a valid legal exaction claim here, plaintiff must show that: (1) money was taken by the government and (2) the exaction violated a provision of the Constitution, a statute, or a regulation. *Andres*, 2005 WL 6112616, at *2.

Here, plaintiff alleges that the FHFA's directive to terminate him without paying the severance compensation called for in his employment agreement constitutes an illegal exaction, in violation of HERA and the Due Process Clause of the Fifth Amendment. Compl. at ¶¶ 60, 71. Plaintiff concedes that he has not paid any money over to the government directly. *See generally* Complaint. And so, to state a plausible illegal exaction claim, plaintiff must show that he has paid money to the government "in effect." *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996). Plaintiff cannot make such a showing.

This Court has recognized an "in effect" illegal exaction in two distinct situations: First, an "in effect" illegal exaction can occur when the government requires a plaintiff to make a payment on its behalf to a third-party. For example, in *Aerolineas*, the United States Court of Appeals for the Federal Circuit held that where the government required an airline to make payments that by law the Immigration and Naturalization Service was obligated to make, the government has "in its pocket" money corresponding to the payments that were the government's statutory obligation to make. *Aerolineas*, 77 F.3d at 1573-74. Second, an "in effect" illegal exaction can also occur when the government exacts property which it later sells and for which it receives money. For example, this Court held in *Bowman* that money received by the government for the sale of property it had taken from a plaintiff constitutes an illegal exaction "in effect." *Bowman*, 35 Fed. Cl. at 401 (stating that "cases such as the instant one—

where the [g]overnment exacts property which it later sells and for which it receives money—must necessarily qualify for consideration under the established illegal exaction jurisdiction").

Neither of those situations are present here. Rather, plaintiff seeks to recover under an illegal exaction theory based upon the premise that the government failed to pay *him* severance compensation provided for under his employment agreement. *See* Compl. at ¶ 75. As this Court noted in an analogous case, if the plaintiff's theory of illegal exaction was correct, then "[e]very successful back pay claim this Court hears could also be characterized as an illegal exaction . . . [t]he same could be said of a breach of contract claim, as the [g]overnment would be holding the money it allegedly owed the government contractor in its pocket." *Andres*, 2005 WL 6112616, at *3. ("[W]hat distinguishes an illegal exaction from a back pay or breach of contract claim[ ] is that in an illegal exaction case the claimant has paid money over to the [g]overnment that he once had in his pocket, and in a back pay or breach of contract claim the claimant is seeking payment of money the claimant has never received."). *Id*. Because plaintiff cannot show that he has paid any money to the government directly or "in effect," he fails to state a plausible illegal exaction claim in the complaint.

## B.     Plaintiff Fails to State a Plausible Takings Claim

Plaintiff similarly fails to state a valid takings claim in his complaint. Plaintiff alleges that the FHFA's directive to terminate him without honoring the severance compensation terms of his employment agreement constitutes a takings without just compensation. Compl. at ¶ 69. In moving to dismiss this claim, the government offers five lines of defense: First, the government argues that plaintiff's contract-based takings claim is jurisdictionally barred by his lapsed contract remedies. Def. Mot. at 25-27. Second, the government maintains that plaintiff has no cognizable property interest in the severance payment terms of his employment agreement. Def. Mot. at 13-20. Third, the government argues that plaintiff fails to show that he had a reasonable investment-backed expectation that Freddie Mac would honor the severance payment terms of his employment agreement. Def. Mot. at 20-23; Def. Rep. at 7-8. Fourth, the government maintains that the FHFA's actions merely frustrated plaintiff's employment agreement and, therefore, could not effectuate a taking. Def. Mot. at 23-24. Finally, the government argues that plaintiff fails to allege that the government's actions in enacting and

implementing HERA were unauthorized.  Def. Mot. at 11-13.  For the reasons discussed below, the Court agrees that dismissal of plaintiff's takings claim is warranted.

### 1.     Plaintiff's Contract Remedies Do Not Foreclose His Takings Claim

As an initial matter, plaintiff's alternative contract remedies against Freddie Mac do not bar his takings claim.  In its motion to dismiss, the government relies upon *United States v. Sherwood*, 312 U.S. 584 (1941), to seek dismissal of plaintiff's takings claim, because plaintiff allowed his breach of contract claim against Freddie Mac to lapse.  Def. Mot. at 25-27.  The government's reliance upon *Sherwood* is misplaced.

In *Sherwood*, the Supreme Court recognized that this Court is without jurisdiction to consider a suit brought against private parties.[5]  But here, plaintiff's constitutional claims are appropriately brought against the government and Freddie Mac is not a necessary party to this action.  It is well-established that this Court has jurisdiction over takings claims brought pursuant to the Constitution.  *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1020 (1984); *see also* 28 U.S.C. § 1491(a)(1) (Under the Tucker Act, the Court has jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . .").  And so, plaintiff's takings claim is not jurisdictionally barred because he could have pursued breach of contract remedies against Freddie Mac.[6]

---

[5] In *Sherwood*, a judgment creditor sought to sue the federal government under the Tucker Act to recover damages for breach of a contract that the government entered into with his judgment debtor.  Because the Supreme Court found that the judgment debtor would have been a necessary party to those proceedings, the Supreme Court held that such a lawsuit was not within the jurisdiction of the Tucker Act.  312 U.S. at 588-89.

[6]  The government also errs in relying upon *Castle v. United States*, 48 Fed. Cl. 187, 218 (2000), *affirmed in relevant part*, 301 F.3d 1328 (Fed. Cir. 2002), to argue that plaintiff fails to state a valid takings claim because of his lapsed contract remedies.  Def. Mot. at 26.  As this Court noted in *Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 77 (2012), "the Federal Circuit did not hold in *Castle* that a plaintiff is precluded from raising a takings claim when its asserted property rights were created by contract; rather, the court merely held that the plaintiffs in that particular case had failed to demonstrate the existence of a compensable property right under the contract." *Id*.

### 2.    Plaintiff Has No Cognizable Property Interest in His Employment Agreement

While plaintiff's takings claim is not jurisdictionally barred, he fails to state a plausible takings claim.  In its motion to dismiss, the government argues that plaintiff has no cognizable property interest in his employment agreement because plaintiff's private contractual rights stand on more fragile footing than tangible property interests under the takings analysis and because plaintiff voluntarily entered into his employment agreement with the understanding that he would be working in a highly-regulated industry.  Def. Mot. at 14-15.  The Court must agree.

It is well established that "the existence of a valid property interest is necessary in all takings claims." *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001).  As a result, a threshold element of a takings claim is whether a plaintiff has a cognizable property interest for purposes of the Fifth Amendment. *Am. Pelagic Fishing Co. L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  If a plaintiff cannot prove that he held a protected property interest, his takings claim must fail. *Webster v. United States*, 74 Fed. Cl. 439, 446 (2006) (citing *Wyatt*, 271 F.3d at 1096 (Fed. Cir. 2001)).

In this regard, this Court has long recognized that valid contracts are property. *See, e.g.*, *Lynch*, 292 U.S. at 579; *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").  Nonetheless, background principles derived from legislation enacted prior to the execution of a contract "'define the range of interests that qualify for protection as "property" under the Fifth'" Amendment. *Perry Capital LLC v. Lew*, No. CV 13-1025 (RCL), 2014 WL 4829559, at *20 (D.D.C. Sept. 30, 2014) (quoting *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1028–30 (1992)); *see also Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) ("Where a citizen voluntarily enters into an area which from the start is subject to pervasive Government control, a property interest is likely lacking.").

The Supreme Court has long recognized that "the 'right to exclude' is doubtless . . . 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 528 (1992) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).  And so, while "'[c]ontracts may create rights of property . . . when

12

**A 12**

contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity.'" *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223-24 (1986) ("'Contracts, however express, cannot fetter the constitutional authority of Congress. . . . Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.'") (quoting *Norman v. Balt. & Ohio R.R. Co.*, 294 U.S. 240, 307-08 (1935)).

The United States Court of Appeals for the Federal Circuit has twice held that the shareholders of statutorily regulated financial institutions lacked the requisite property interests to support a takings claim. *Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994); *Cal. Housing Sec., Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992). In *Golden Pacific*, the Federal Circuit found that, given the existing regulatory structure permitting the appointment of a conservator or receiver, the financial institutions in that case "lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership" on the institutions. *Golden Pacific*, 15 F.3d at 1073 (quoting *California Housing*, 959 F.2d at 958) (internal quotation marks omitted). In *California Housing*, the Federal Circuit similarly held that the owner of a failed savings and loan institution had no cognizable property interest in the institution's assets, because the owner had no right to exclusive possession given that the government could place the institution into conservatorship and receivership. *California Housing*, 959 F.2d at 958. "*Golden Pacific* and *California Housing* stand for the general notion that investors have no right to exclude the government from their alleged property interests when the regulated institution in which they own shares is placed into conservatorship or receivership." *Perry Capital*, 2014 WL 4829559, at *22; *see also California Housing*, 959 F.2d at 958 (finding no right to exclude when a conservatorship or receivership is legally imposed).

The holdings in *Golden Pacific* and *California Housing* are instructive here. In this case, Freddie Mac−like the financial institutions in *Golden Pacific* and *California Housing*−operated in a heavily regulated environment. Congress established the FHFA's predecessor, OFHEO, in 1992 under the Safety and Soundness Act. *See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102−550, §§ 1301−95, 106 Stat. 3672, 3941−4012, 12 U.S.C. § 4561 *et seq.* Since that time, Freddie Mac has been subject to regulatory oversight, including the potential for conservatorship under which the regulatory agency succeeds to "all

the powers of the shareholders, directors, and officers of the enterprise." *See* 12 U.S.C. § 4620(a) (1992); *see also* 12 U.S.C. § 4617(b)(2)(A)(i) (2008) (authority to place Freddie Mac into conservatorship). In addition, the Safety and Soundness Act−and later HERA−expressly authorized federal regulators to prohibit plaintiff's executive compensation if the government found the compensation to be unreasonable. 12 U.S.C. § 4518(a).[7] Given this regulatory environment, plaintiff "lacked the fundamental right to exclude the government" from his property rights under his employment agreement when the FHFA placed Freddie Mac into

---

[7] The relevant portion of the Safety and Soundness Act provides as follows:

> **Prohibition of excessive compensation.**
>
> (a) IN GENERAL.−The Director shall prohibit the enterprises from providing compensation to any executive officer of the enterprise that is not reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services companies) involving similar duties and responsibilities.

12 U.S.C. § 4518(a) (1992).

The relevant portion of the Housing and Economic Recovery Act provides as follows:

> **Prohibition and withholding of executive compensation.**
>
> (a) IN GENERAL.−The Director shall prohibit the regulated entities from providing compensation to any executive officer of the regulated entity that is not reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services companies) involving similar duties and responsibilities.
>
> (b) FACTORS. In making any determination under subsection (a), the Director may take into consideration any factors the Director considers relevant, including any wrongdoing on the part of the executive officer, and such wrongdoing shall include any fraudulent act or omission, breach of trust or fiduciary duty, violation of law, rule, regulation, order, or written agreement, and insider abuse with respect to the regulated entity. *The approval of an agreement or contract pursuant to section 1723a(d)(3)(B) of this title or section 1452(h)(2) of this title shall not preclude the Director from making any subsequent determination under subsection (a).*

12 U.S.C. § 4518 (2008) (emphasis supplied).

conservatorship in 2008. *Cf. California Housing Sec.*, 959 F.2d at 959; *see also Perry Capital*, 2014 WL 4829559, at *22.

Plaintiff attempts to distinguish this case from the holdings in *Golden Pacific* and *California Housing* by arguing that he has a cognizable property interest here, because Congress enacted HERA after he entered into his employment agreement. Pl. Opp. at 20-21. And so, plaintiff contends that the regulatory scheme governing Freddie Mac changed when Congress enacted that law in 2008. *Id.* Plaintiff's argument is unavailing.

The government demonstrated during oral argument that the Safety and Soundness Act, which was in effect at the time plaintiff entered into his employment agreement, "authorized the regulator to put Freddie Mac into conservatorship and . . . provided authority to regulate executive compensation." Tr. at 8. Moreover, when Congress enacted HERA in 2008, Congress modified these existing authorities to make clear that the FHFA could prohibit executive compensation that had previously been approved. 12 U.S.C. § 4518(c) (2008); Tr. at 11. Plaintiff contends that Congress changed the regulatory environment concerning executive compensation when it enacted HERA, by expressly providing that the FHFA could prohibit executive compensation previously approved by OFHEO. But, plaintiff points to no authority in the Safety and Soundness Act that could have guaranteed that the government could not later change its mind after OFHEO approved his compensation.

Given the regulatory environment at the time he entered into his employment agreement, and the authority that federal regulators had to prohibit executive compensation, plaintiff simply could not have had a cognizable property interest in the severance compensation called for under his employment agreement. For this reason, the Court must dismiss plaintiff's takings claim. RCFC 12(b)(6); *see also Iqbal*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

### 3. Plaintiff Fails To Advance a Plausible Takings Theory

Even if plaintiff could show a cognizable property interest in the severance compensation under his employment agreement—which he cannot—his takings claim would fail under applicable takings precedent.

First, plaintiff fails to allege a plausible categorical or physical takings in his complaint. As discussed above, a categorical takings occurs "where regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. at 1015; *Lost Tree Vill. Corp. v. United States*, No. 2014-5093, 2015 WL 3448943, at *4 (Fed. Cir. June 1, 2015) (finding a regulatory takings under *Lucas* even if *de minimis* residual value remains in the land). Even assuming that a categorical takings analysis could apply to intangible property−such as plaintiff's employment agreement−plaintiff's categorical takings theory must fail, because plaintiff acknowledges that he has received 19,735 of the 78,940 shares of restricted stock units granted under his employment agreement. Compl. at ¶ 56; Def. Rep. at 14.

Plaintiff fares no better under a physical takings theory. A physical or *per se* takings occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of "a practical ouster of [the property owner's] possession." *Transportation Company v. Chicago*, 99 U.S. 635, 642 (1878); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982); *Norman v. United States*, 429 F.3d 1081, 1090 (2005) (A court cannot find a physical takings of property unless the government has authorized physical occupation of, or taken title to, the property.). But, here, the government has neither physically occupied, nor taken title to, plaintiff's property.

Plaintiff likewise fails to state a valid regulatory takings claim because he could not have a reasonable investment-backed expectation to receive his severance compensation. "In determining whether a reasonable investment-backed expectation exists, one relevant consideration is the extent of government regulation within an industry." *Ascom Hasler Mailing Sys., Inc.* v. *U.S. Postal Serv.*, 885 F. Supp. 2d 156, 195 (D.D.C. 2012) (collecting cases); *see also Monsanto*, 467 U.S. at 1005 ("[T]he force of [the reasonable investment-backed expectations] factor [here] is so overwhelming . . . that it disposes of the takings question . . . ."). Given the regulatory scheme governing Freddie Mac, plaintiff simply could not have had a reasonable investment-backed expectation to receive the severance compensation under his employment agreement.[8]  *See* 12 U.S.C. § 4518(a).

---

[8]  The Court evaluates plaintiff's regulatory takings claim under the *ad hoc* analysis set forth in the Supreme Court's decision in *Penn Central* by weighing (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn*

Nonetheless, plaintiff argues that he has a reasonable investment-backed expectation here, because no regulatory authority existed at the time that allowed the government to nullify the severance compensation provisions under his contract once that compensation had been approved. Pl. Opp. at 18-19. But, as discussed above, there is no provision in the Safety and Soundness Act that would have prohibited the government from changing its mind–as it did here–and later deciding to prohibit plaintiff's executive compensation in light of new circumstances within the nation's housing industry. To be sure, plaintiff voluntarily entered into his employment agreement within this regulatory environment and that environment did not change in any material way when Congress enacted HERA.

In sum, plaintiff simply could not have developed a historically rooted expectation of compensation in the event that the government placed Freddie Mac into conservatorship–as it eventually did in 2008. *See California Housing*, 959 F.2d at 958; *Perry Capital*, 2014 WL 4829559, at *23; *Connolly*, 475 U.S. at 227 ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (citations omitted); *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Trust for Southern California*, 508 U.S. 602, 645 (1993) (same).[9] Given this, dismissal of plaintiff's takings claim is appropriate. *See Chang v. United States*, 859 F.2d 893, 898 (Fed. Cir. 1988) (affirming dismissal of Fifth Amendment takings claim for failure to state a claim upon which relief could be granted).[10]

---

*Central*, 438 U.S. at 124. Plaintiff is not required to demonstrate favorable results under all three *Penn Central* factors in order for the Court to find a taking–it is a balancing test. *See Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878–79 (D.C. Cir. 1999) (*Penn Central* submits "three primary factors [to be] weigh[ed] in the balance").

[9]  The remaining *Penn Central* factors–the character of the government action and economic benefit–do not revive plaintiff's takings claim. Plaintiff acknowledges that Congress enacted HERA for important reasons–"to preserve Freddie Mac's assets for the benefit of the general public so that Freddie Mac could continue fulfilling its [g]overnment-mandated mission." Compl. at ¶¶ 51, 58. Moreover, plaintiff acknowledges that he received a portion of the shares of the restricted stock provided for under his employment agreement at the time Freddie Mac terminated his employment. *Id.* at ¶ 56. And so, it would appear that the economic impact of the government's actions are far outweighed by the absence of a reasonable investment-backed expectation that the plaintiff would receive this compensation.

[10] Given the Court's determination that plaintiff has no cognizable property interest in the severance compensation under his employment agreement, the Court need not reach the question

The Court does not take the decision to dismiss this case lightly. Plaintiff has not had the opportunity to conduct discovery to further develop his claims. But, there are no set of material facts that plaintiff could demonstrate *via* discovery that would make either his illegal exaction claim or takings claim viable.

Plaintiff concedes that he has not paid any money to the government and there is no way to read the allegations in the complaint to state a plausible illegal exaction claim. Furthermore, plaintiff cannot show that he has a cognizable property interest to give rise to a valid takings claim, given the regulatory scheme governing Freddie Mac when plaintiff entered into his employment agreement. And so "[w]hile regulatory takings require a 'more fact specific inquiry'. . . no supplementation of the factual record could alter dismissal here." *Perry Capital*, 2014 WL 4829559, at *23 (internal citation omitted).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the government's motion to dismiss.

The Clerk shall enter judgment accordingly.

---

of whether his takings claim is precluded by the Supreme Court's decision in *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), and its progeny. Nonetheless, the Court is unpersuaded by the government's argument that no takings occurred here, because the FHFA's actions merely frustrated plaintiff's employment agreement. Def. Mot. at 23-24. The Federal Circuit recently held in *A & D Auto Sales* that government action may give rise to a takings where the effect of the government action is direct and intended, rather than collateral or unintended, or where the action affected a general class. *See A & D Auto Sales*, 748 F.3d at 1154. Here, the FHFA's directive specifically directed that Freddie Mac not pay the severance compensation under plaintiff's employment agreement. *See* Compl. at ¶ 53. And so, plaintiff's rights under this agreement were not merely frustrated by the government's actions. Rather, those rights were directly and intentionally terminated by the FHFA's actions. The Court is equally unpersuaded by the government's argument that plaintiff's takings claim should be dismissed because he fails to allege that the FHFA's actions were authorized. *See* Def. Mot. at 11-13; Compl. at ¶ 70. To the extent that plaintiff's complaint is defective for this reason, the appropriate remedy is to amend the complaint, rather than to dismiss his claim. *See* RCFC 15(a).

Each party to bear their own costs.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge