No. 15-5100

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*ANTHONY PISZEL,*

Plaintiff-Appellant,

v.

*THE UNITED STATES,*

Defendant-Appellee.

APPEAL FROM THE UNITED STATES
COURT OF FEDERAL CLAIMS
CASE NO. 1:14-CV-00691
JUDGE LYDIA KAY GRIGGSBY

**PLAINTIFF-APPELLANT ANTHONY PISZEL'S
PETITION FOR REHEARING *EN BANC***

William E. Donnelly, Esq.
MURPHY & McGONIGLE, P.C.
555 13th Street, N.W., Suite 410
Washington, D.C. 20004
(202) 661-7000

James K. Goldfarb, Esq.
Michael V. Rella, Esq.
MURPHY & McGONIGLE, P.C.
1185 Avenue of the Americas
21st Floor
New York, NY 10036
(212) 880-3999

*Attorneys for Plaintiff-Appellant
Anthony Piszel*

FORM 9.  Certificate of Interest

Form 9
Rev. 03/16

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Anthony Piszel     **v.**     United States

Case No.     2015-5100

## CERTIFICATE OF INTEREST

Counsel for the:

☒ (petitioner) ☐ (appellant) ☐ (respondent) ☐ (appellee)☐ (amicus)☐ (name of party)

Anthony Piszel

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Anthony Piszel | N/A | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

N/A

September 29, 2016

Date

*William T. Donnelly*

Signature of counsel

Please Note: All questions must be answered

William E. Donnelly

Printed name of counsel

cc:     David A. Harrington, Esq.

Reset Fields

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST……………………………………………...i

TABLE OF AUTHORITIES………………………………………………...iii

STATEMENT OF COUNSEL PURSUANT TO RULE 35(b)…………………1

INTRODUCTION……………………………………………………………….2

BACKGROUND………………………………………………………………...3

    A. Freddie Mac and the Government Agree to Provide
       Mr. Piszel with Contractual Termination Benefits………………………3

    B. The Government Orders Freddie Mac to Terminate
       Mr. Piszel and to Not Pay His Contractual Termination Benefits…………4

    C. The Panel's Decision……………………………………………………5

ARGUMENT FOR REHEARING *EN BANC*…………………………………6

I.    THE PANEL'S NEW THRESHOLD BURDEN
     MISAPPLIES WELL-SETTLED TAKINGS LAW………………………6

II.   THE PANEL'S DECISION IS CONTRARY TO
     SUPREME COURT AND FEDERAL CIRCUIT PRECEDENT…….…...10

III.  THE PANEL'S NEW THRESHOLD BURDEN
     EFFECTIVELY EVISCERATES A CONSTITUTIONAL RIGHT……...12

IV.  THE PANEL'S NEW BURDEN CREATES A FACT ISSUE THAT
     PRECLUDES DISMISSAL AT THE MOTION TO DISMISS STAGE…13

CONCLUSION…………………………………………………………………..16

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*A&D Auto Sales, Inc. v. U.S.*,
  748 F.3d 1142 (Fed. Cir. 2014) ........................................................ 1, 8, 11, 15

*Allegre Villa. v. U.S.*,
  60 Fed. Cl. 11 (2004) ....................................................................... 9

*Armstrong v. U.S.*,
  364 U.S. 40 (1960) .......................................................................... 1

*Brendsel v. OFHEO*,
  339 F. Supp. 2d 52 (D.D.C. 2004) ................................................. 13

*Castle v. U.S.*,
  301 F.3d 1328 (Fed. Cir. 2002) ...................................................... 7

*Cent. Exploration New Orleans, Inc. v. U.S.*,
  103 Fed. Cl. 70 (2012) .................................................................... 9

*Chancellor Manor v. U.S.*,
  331 F.3d 891 (Fed. Cir. 2003) ..................................................... 1, 11

*Cienega Gardens v. U.S.*,
  331 F.3d 1319 (Fed. Cir. 2003) ................................................... 1, 11

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*,
  508 U.S. 602 (1993) .................................................................... 1, 10

*Cross-McKinley v. F.D.I.C.*,
  No. CV 211-172, 2013 WL 870309 (S.D. Ga. Mar. 7, 2013) ............ 14

*Faigin v. Signature Grp. Holdings, Inc.*,
  150 Cal. Rptr. 3d 123 (Cal. Ct. App. 2012) .................................. 14

*Hill v. Commerce Bancorp, Inc.*,
  No. 09-3685 RBK/JS, 2012 WL 694639 (D.N.J. Mar. 1, 2012) ......... 14

*Howell v. F.D.I.C.*,
  986 F.2d 569 (1st Cir. 1993) .......................................................... 14

*Hughes Commc'ns Galaxy, Inc. v. U.S.*,
  271 F.3d 1060 (Fed. Cir. 2001) ............................................................8

*Klamath Irrigation Dist. v. U.S.*,
  67 Fed. Cl. 504 (2005), *rev'd on other grounds*,
  635 F.3d 505 (Fed. Cir. 2011) ................................................9

*La Van v. FDIC*,
  382 F.3d 1340 (Fed. Cir. 2004) ..............................................7

*Norman v. B. & O. R. Co.*,
  294 U.S. 240 (1935).................................................................1

*Omnia Commercial Co. v. U.S.*,
  261 U.S. 502 (1923)................................................................1

*Pa. Coal Co. v. Mahon*,
  43 S. Ct. 158 (1922)..........................................................1, 10

*Prudential Ins. Co. of Am. v. U.S.*,
  801 F.2d 1295 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987) ...................9

*Solsby v. Plaza Bank*,
  No. G049272, 2015 WL 668711 (Cal. Ct. App. Feb. 17, 2015) ..........................14

*Stockton East Water District v. U.S.*,
  583 F.3d 1344 (Fed. Cir. 2009) ........................................................1, 8

*U.S. v. Gen'l Motors Corp.*,
  323 U.S. 373 (1945)..........................................................1, 10

*U.S. v. Petty Motor Co.*,
  327 U.S. 372 (1946)..........................................................1, 10

*United Nuclear v. U.S.*,
  912 F.2d 1432 (Fed. Cir. 1990) ........................................1, 12

**Statutes**

12 U.S.C. § 4518(e)(1) (2008) ..........................................................4

## <u>STATEMENT OF COUNSEL PURSUANT TO RULE 35(b)</u>

Based on my professional judgment, I believe this appeal requires an answer to the following precedent setting question of exceptional importance: When the Government orders a party not to perform a private contract with a claimant, must the Government also "substantially take away" the claimant's right to recover contractual damages from the private party before the claimant can sue the Government for a Fifth Amendment taking of its contract?

Furthermore, based on my professional judgment, I believe the Panel's decision is contrary to at least the following decisions of the Supreme Court and this Court:  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993); *Armstrong v. U.S.*, 364 U.S. 40 (1960); *U.S. v. Petty Motor Co.*, 327 U.S. 372 (1946); *U.S. v. Gen'l Motors Corp.*, 323 U.S. 373 (1945); *Norman v. B. & O. R. Co.*, 294 U.S. 240 (1935); *Omnia Commercial Co. v. U.S.*, 261 U.S. 502 (1923); *Pa. Coal Co. v. Mahon*, 43 S. Ct. 158 (1922); *A&D Auto Sales, Inc. v. U.S.*, 748 F.3d 1142 (Fed. Cir. 2014); *Stockton East Water Dist. v. U.S.*, 583 F.3d 1344 (Fed. Cir. 2009); *Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003); *Chancellor Manor v. U.S.*, 331 F.3d 891 (Fed. Cir. 2003); *United Nuclear v. U.S.*, 912 F.2d 1432 (Fed. Cir. 1990).

/s/ William E. Donnelly
William E. Donnelly
*Attorney of Record for Plaintiff-Appellant*
*Anthony Piszel*

1

**INTRODUCTION**

Through its decision, the Panel creates an unprecedented threshold burden that citizens must now satisfy before exercising their constitutional right to sue the Government for a Fifth Amendment taking of a private contract – a contract to which the Government is not a party. Before the Panel's decision, no court had required a citizen suing the Government for taking a private contract to first show that the Government had "substantially take[n] away the [citizen's] right to" pursue damages in a private action against the breaching counterparty. Now, however, a citizen must do so.

The Panel's decision misconstrues well-settled law and is contrary to nearly a century of Supreme Court precedent, as well as binding precedent from this Court. Indeed, until the Panel's decision, the threshold burden had been strictly limited to takings claims based on *Government* contracts; no court had ever extended it to limit a claim alleging a taking of a *private* contract. The Panel itself acknowledged that in the private contracts context, "the Supreme Court has consistently addressed takings claims *even though claimants could have pursued breach of contract claims against private parties*." Of course, if "claimants could have pursued breach of contract claims against private parties," the Government in those cases necessarily did *not* "substantially take away the [claimants'] right to

damages in the event of a breach." Cutting against the grain of precedent, the Panel's decision now prevents takings claims in those very circumstances.

In addition to being without precedent, the threshold burden is without reason. It prevents an injured citizen from ever suing the Government for taking a private contract unless the Government also expressly limits the citizen's ability to sue his or her contractual counterparty for the breach. It is hard to imagine the Government taking this extra step in light of the Panel's decision. Thus, the decision encourages governmental medaling in private affairs of the worst kind.

The Court *en banc* should rehear these issues and reverse.

## BACKGROUND

A.    **Freddie Mac and the Government Agree to Provide Mr. Piszel with Contractual Termination Benefits**

In the fall of 2006, Freddie Mac began recruiting Mr. Piszel to become its CFO to restore Freddie Mac's financial reporting credibility. (A27 ¶ 16, A28 ¶ 19).[1] At that time, Mr. Piszel had earned and accrued significant deferred compensation as CFO at his former employer. (A27 ¶ 16). Freddie Mac learned of this deferred compensation and agreed that Mr. Piszel would receive certain contractual benefits if he were terminated "without cause". (A28 ¶¶ 20,

---

[1] "A" refers to the parties' Joint Appendix on this appeal. (Dkt. 41).

22).  These contractual benefits were intended to make Mr. Piszel whole for the deferred compensation that he was forfeiting to join Freddie Mac.  (*Id.* ¶ 22).

Pursuant to Freddie Mac's Charter Act, OFHEO's Director, James B. Lockhart III, reviewed and approved Mr. Piszel's contractual termination benefits. (A29 ¶ 26).  If Mr. Lockhart had not approved them, Mr. Piszel would not have left his former employer and relinquished his accrued deferred compensation to join Freddie Mac.  (A30 ¶ 27).  Mr. Piszel joined Freddie Mac as CFO in November 2006. (*Id.* ¶ 29).  The Government was not a party to his employment agreement with Freddie Mac.  Mr. Piszel achieved the two primary goals that Freddie Mac set for him by mid-summer 2008, and was considered the best performing executive at Freddie Mac in 2007.  (*Id.* ¶¶ 29-30, A31 ¶ 35).

In July 2008, Congress enacted the Housing Economic Recovery Act ("HERA").  HERA replaced OFHEO with the FHFA, and gave FHFA expanded conservatorship authority and new powers to prohibit "golden parachute" payments.  12 U.S.C. § 4518(e)(1) (2008).  On September 7, 2008, the Government exercised its new authority and placed Freddie Mac into conservatorship.  (A34 ¶ 48).

### B.    The Government Orders Freddie Mac to Terminate Mr. Piszel and to Not Pay His Contractual Termination Benefits

Two weeks later, relying solely on HERA's new "golden parachute" provision, Mr. Lockhart ordered that Freddie Mac immediately terminate Mr.

4

Piszel "without cause", and to not pay him any of his contractual termination payments. (A35 ¶ 52, A36 ¶ 54). Freddie Mac complied, notwithstanding that neither FHFA, nor any other regulator or court, has ever found that Mr. Piszel was responsible for Freddie Mac's financial condition or the conservatorship. (A36 ¶ 55, A37 ¶ 62). Indeed, after investigating Freddie Mac, the FHFA acknowledged that it found no evidence that Mr. Piszel engaged in any wrongful conduct. (A38 ¶ 63). As a result, the FHFA moved to dismiss all claims against Mr. Piszel in two pending derivative actions, and the courts granted the motions. (*Id.* ¶ 64).

### C.    The Panel's Decision

Disagreeing with the lower court, the Panel "conclude[d] that Mr. Piszel had a cognizable Fifth Amendment property interest in his contract rights." (Addendum at 14). The Panel also rejected the Government's argument that "Mr. Piszel's failure to pursue a contract remedy [against Freddie Mac] is an absolute bar to his bringing a takings claim against the government." (*Id.*). In distinguishing a line of cases limiting takings actions where – unlike here – plaintiffs contracted directly with the *Government*, the Panel held that "we are aware of no case that mandates that a claimant pursue a remedy against a *private* party before seeking compensation from the government." (*Id.* at 16 (emphasis in original)). The Panel concluded that "[w]e therefore find no basis for the government's argument that Mr. Piszel had to pursue a breach of contract claim

against Freddie Mac before bringing a takings claim, even though … the existence of a remedy for breach of contract is highly relevant to the takings analysis in this case." (*Id.*).

In affirming the dismissal, however, the Panel held that the "government's instruction to Freddie Mac did not take anything from Mr. Piszel because, even after the government's action, Mr. Piszel was left with the right to enforce his contract against Freddie Mac in a breach of contract action." (*Id.* at 17). The basis for the Panel's decision was the following new threshold burden: "to effect a taking of a contractual right when performance has been prevented, the government must substantially take away the right to damages in the event of a breach." (*Id.*). The Panel also rejected Mr. Piszel's argument that the legal impossibility defense would have precluded him from recovering from Freddie Mac for breach of contract. (*Id.* at 19-25).

## ARGUMENT FOR REHEARING *EN BANC*

## I.    THE PANEL'S NEW THRESHOLD BURDEN MISAPPLIES WELL-SETTLED TAKINGS LAW

The Panel's decision creates a new threshold burden that citizens must satisfy before exercising their constitutional right to sue the Government for taking a private contract. Now, citizens may no longer sue the Government for taking a private contract unless the Government also "substantially take[s] away the right to damages in the event of a breach." (Addendum at 17). The Panel's new threshold

burden applies even when – as here – the Government directly interferes with a private contract by ordering one party not to perform, causing the non-breaching party substantial harm.

The Panel's decision represents a profound change in the law.  It is well-settled that the burden the Panel imposed on Mr. Piszel applies only in takings claims based on *Government* contract cases; it does not apply to takings claims based on *private* contracts.  Indeed, the sole decision that the Panel cited in support of extending the burden to private contract cases is, in fact, a Government contract case.  (*Id.* (citing *Castle v. U.S.*, 301 F.3d 1328, 1342 (Fed. Cir. 2002))).[2]  **And until the Panel's decision, no court had ever extended *Castle* to limit a takings claim based on a *private* contract; courts had only applied it to limit takings claims based on *Government* contracts.**  *See, e.g., La Van v. FDIC*, 382 F.3d 1340, 1352 (Fed. Cir. 2004) (citing *Castle* to affirm the dismissal of a takings claim based on a *Government* contract because "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed.").

Sound reasons exist for not extending the threshold burden to private contract cases.  As the Panel itself acknowledged, "[t]akings claims rarely arise under government contracts because the Government acts in its commercial or

---

[2] Unless stated otherwise, internal quotations and citations are omitted, and emphasis is added.

proprietary capacity in entering contracts, rather than in its sovereign capacity and therefore the remedies arise from the contracts themselves". (Addendum at 15). Thus, imposing the threshold burden in Government contract cases prevents turning "nearly all Government contract breaches" into constitutional cases. *Hughes Commc'ns Galaxy, Inc. v. U.S.*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

In contrast, in private contract cases, "the government did not bargain or contract with the plaintiffs, and the plaintiffs have no ordinary commercial remedy against the government." *A&D Auto Sales, Inc. v. U.S.*, 748 F.3d 1142, 1156 (Fed. Cir. 2014). Thus, the risk of turning all Government contract breaches into constitutional cases is absent in the private contract context. Given this distinction, the Panel observed "we are aware of no case that mandates that a claimant pursue a remedy against a *private* party before seeking compensation from the government." (*Id.* at 16 (emphasis in original)). Yet the Panel's decision does just that – it mandates that claimants pursue breach of contract claims against private parties instead of suing the Government for a taking, unless the Government "substantially take[s] away" the private breach remedy.

Extending *Castle* was particularly unsound because this Court and others have expressly limited *Castle* on several occasions, holding that a plaintiff's right to damages for breach of contract does *not* preclude a takings claim. In *Stockton East Water District v. U.S.*, 583 F.3d 1344 (Fed. Cir. 2009), this Court

vacated the dismissal of a takings claim based on a Government contract, even

though the plaintiff had also sued the Government for breach of contract.  The

Court stated that the general rule limiting takings actions where (among other

things) "remedies are provided by the contract … is nothing more than a passing

comment about government contract law", and "cannot be understood as

precluding a party from alleging" both a breach of contract claim and a takings

claim against the Government.  *Id.* at 1368.[3]  Stated another way, even though the

Government did not "substantially take away" plaintiff's right to damages for

breach of contract, this Court allowed a takings claim to move forward.  The

Panel's decision squarely contradicts this Court's *Stockton* decision.  *See Cent.*

*Exploration New Orleans, Inc. v. U.S.*, 103 Fed. Cl. 70, 81 (2012) (denying motion

to dismiss a takings claim and rejecting the Panel's "threshold test" as

"inconsistent with the Federal Circuit's binding decision in *Stockton East*").[4]

---

[3] *See also see also Prudential Ins. Co. of Am. v. U.S.*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987) (holding that a plaintiff suing the Government for breach of contract "may have an alternate avenue of relief under the Takings Clause of the Fifth Amendment").

[4] The Court of Federal Claims has also held that *Castle* does *not* limit takings actions that are based on *private* contracts, such as Mr. Piszel's.  *See, e.g.*, *Klamath Irrigation Dist. v. U.S.*, 67 Fed. Cl. 504, 532 (2005) (holding that the rule precluding takings actions when plaintiffs have a right to damages for breach of contract "applies to the [plaintiffs] *only to the extent that they actually have contract claims against the United States.*"), *rev'd on other grounds*, 635 F.3d 505 (Fed. Cir. 2011); *Allegre Villa. v. U.S.*, 60 Fed. Cl. 11, 19 (2004) (same).

## II.    THE PANEL'S DECISION IS CONTRARY TO SUPREME COURT AND FEDERAL CIRCUIT PRECEDENT

The Panel's adoption of a new threshold burden for actions alleging the taking of private contracts contradicts Supreme Court precedent. The Panel acknowledged that for nearly a century, "the Supreme Court has consistently addressed takings claims *even though claimants could have pursued breach of contract claims against private parties*." (Addendum at 16 (collecting Supreme Court cases)); *see also Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 605, 641-646 (1993) (defendant subjected plaintiff to liability based on new legislation despite contracts limiting plaintiff's liability); *U.S. v. Petty Motor Co.*, 327 U.S. 372, 373-375 (1946) (finding a taking when the Government took tenants' entire leasehold interests via condemnation); *U.S. v. Gen'l Motors Corp.*, 323 U.S. 373, 374-375, 383-384 (1945) (finding a taking when the Government took a portion of tenants' leasehold interests via eminent domain); *Pa. Coal Co. v. Mahon*, 43 S. Ct. 158 (1922) (finding a taking when a new statute destroyed plaintiff's contract right to mine under property).

As the Panel correctly noted, the plaintiffs in the Supreme Court cases it cited (and in the Supreme Court cases cited above) "*could have pursued breach of contract claims against private parties*" (Addendum at 16), just as Mr. Piszel "could have pursued breach of contract claims" against Freddie Mac. Accordingly, the Government in those cases could *not* have – and in fact, did *not* – "substantially

10

take away the [plaintiffs'] right to damages in the event of a breach." (*Id.* at 17).

Yet in each of the cases, the Supreme Court considered the takings claims on the

merits, and in certain cases, actually found a taking notwithstanding the availability

of private contract damages. The Panel's decision simply cannot be squared with

this controlling Supreme Court precedent.

The Panel's decision is also contrary to this Court's own binding

precedent. Indeed, this Court consistently addresses claims alleging the taking of

private contracts even when the Government does *not* "substantially take away the

[plaintiffs'] right to damages in the event of a breach." *See, e.g., A&D Auto Sales,

Inc. v. U.S.*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (affirming the denial of the

Government's motion to dismiss plaintiffs' takings claim where the Government

ordered GM and Chrysler to terminate the plaintiffs' franchise agreements);[5]

*Cienega Gardens v. U.S.*, 331 F.3d 1319, 1323 (Fed. Cir. 2003) (finding a taking

where new legislation nullified the contractual right of owners of federally-

subsidized housing projects to pre-pay their mortgages); *Chancellor Manor v. U.S.*,

331 F.3d 891, 893 (Fed. Cir. 2003) (reversing dismissal of a takings claim on the

---

[5] The Panel attempts to distinguish *A&D* by stating that, even though "the plaintiff had a theoretical claim against the bankruptcy estate", "there [was] no question that [the plaintiffs] have alleged that their [franchises] have no value after the government action." Addendum at 26 n.9. But just as the plaintiffs did in *A&D*, Mr. Piszel alleged that the Government's action rendered his contractual interests "worthless". (A39 ¶ 69).

same facts as *Cienega Gardens*); *United Nuclear v. U.S.*, 912 F.2d 1432, 1433 (Fed. Cir. 1990) (finding a taking where the Government refused to approve the plaintiff's contractual right to mine under its leases with an Indian tribe).  In each case, the plaintiffs could have sued private parties for breach of contract.  But they sued the Government for taking their private contract rights instead.  And this Court either found a taking, or allowed the takings claims to move forward.

## III.    THE PANEL'S NEW THRESHOLD BURDEN EFFECTIVELY EVISCERATES A CONSTITUTIONAL RIGHT

The Panel's decision effectively abolishes takings claims arising from private contracts.  Before the Panel's decision, the finding of a cognizable property interest was the only threshold burden for a takings claim based on a private contract.  (*Id.* at 11).  Now, however, a citizen must *also* show that the Government "substantially t[ook] away the right to damages in the event of a breach." Accordingly, unless the Government takes some action to expressly limit a plaintiff's private breach remedy – an unlikely scenario after the Panel's decision – a plaintiff no longer can sue the Government for such a taking.  Instead, it will be limited to suing a private party for breach of contract, even when the Government orders the private party not to perform the contract.  In effect, the Panel's decision grants the Government free reign to meddle in private contracts with impunity.

The Panel's new burden is also likely to have broad public policy implications that may affect the United States economy.  For example, it

discourages anyone from contracting with regulated entities – utilities, financial institutions, and insurance companies, for example – for fear that their contract could be taken without recourse against the Government.  This is especially true when regulated entities are struggling financially in adverse economic conditions and need new leadership or outside expertise to help right the ship and bolster the economy.  Highly qualified individuals and entities who would otherwise be inclined to contract with such a company may now be unwilling to do so, given that their ability to receive their contractual compensation would be uncertain.

## IV.    THE PANEL'S NEW BURDEN CREATES A FACT ISSUE THAT PRECLUDES DISMISSAL AT THE MOTION TO DISMISS STAGE

Applying the new threshold burden at the motion to dismiss stage would be premature.  As Mr. Piszel argued, suing a private party who the Government orders not to perform a contract would be fruitless because the party would argue it was impossible to perform in light of the Government's order.[6]  The Panel's decision now requires the plaintiff to show – on a motion to dismiss, before *any* discovery – that the non-performing party's impossibility defense would have been successful *if* the plaintiff sued it for breach of contract.  Here, the Panel asserted three arguments to show Freddie Mac's impossibility defense would not

---

[6] *See, e.g.*, *Brendsel v. OFHEO*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (holding that if Freddie Mac's former CEO sued Freddie Mac for breach of contract, "Freddie Mac would likely present the defense that it was acting pursuant to OFHEO's order", which is a "potentially valid" defense).

have defeated Mr. Piszel's contract claim.  But each finding was premature as a matter of law.

First, the Panel asserted that Mr. Piszel "*could have sought to prove*" that the golden parachute provision did not preclude his termination payments by arguing that the payments were really "made pursuant to a bona fide deferred compensation plan."  (*Id.* at 20-22).[7]  But as the cases cited by the Panel show, the exception to the golden parachute rule is a fact-intensive issue that the Panel should not have decided on a motion to dismiss without *any* discovery.  *See Solsby v. Plaza Bank*, No. G049272, 2015 WL 668711, at *2 (Cal. Ct. App. Feb. 17, 2015) (relying on facts "fleshed out in connection with the Bank's *motion for summary judgment*", including deposition testimony); *Hill v. Commerce Bancorp, Inc.*, No. 09-3685 RBK/JS, 2012 WL 694639, at *9 (D.N.J. Mar. 1, 2012) (holding that a "genuine issue of material fact" at the *summary judgment stage* precluded a determination of whether an exception to a golden parachute rule applied).[8]

_____

[7] The Panel cites to Mr. Piszel's complaint to argue that he alleged his termination benefits were permissible deferred compensation payments. (Addendum at 21).  But the allegations were limited to Mr. Piszel's exaction claim, not his takings claim. (*Compare* A37 ¶ 61 *with* A39 ¶ 70).

[8] Two other decisions the Panel cited addressed a summary judgment motion and an appeal after a jury verdict.  *Cross-McKinley v. F.D.I.C.*, No. CV 211-172, 2013 WL 870309, at *1 (S.D. Ga. Mar. 7, 2013) (summary judgment); *Faigin v. Signature Grp. Holdings, Inc.*, 150 Cal. Rptr. 3d 123, 128 (Cal. Ct. App. 2012) (jury trial).  The last case did not address an exception to a golden parachute rule. *See Howell v. F.D.I.C.*, 986 F.2d 569 (1st Cir. 1993).

Second, the Panel speculated that the impossibility defense would not have been available to Freddie Mac if Freddie Mac or Mr. Piszel could have "secured permission" from FHFA to pay Mr. Piszel his contractual benefits. (Addendum at 22-24). The Panel then faulted Mr. Piszel for not alleging whether he or Freddie Mac ever sought such permission. (*Id.*). But Mr. Piszel was not required to plead a legal defense – impossibility – in his complaint. In any event, Mr. Piszel alleged that FHFA ordered Freddie Mac to not pay Mr. Piszel his termination benefits. (A35-36, ¶¶ 52-54). It would have been futile to ask that same entity to change its mind and permit them. In fact, discovery will show that Mr. Piszel *did* in fact request that FHFA allow Freddie Mac to pay his termination benefits several times, and FHFA said "no" each time.

Third, the Panel further speculated that "[i]n a breach action, the courts *might* have concluded that Freddie Mac bore the risk of regulatory intervention, thus depriving it of an impossibility defense." (Addendum at 25). But dismissal of Mr. Piszel's complaint based on conjecture about what another court would have done with a case Mr. Piszel was not required – until the Panel's decision – to bring is premature. Indeed, this Court has refused to dismiss a takings claim despite plaintiffs' alleged pleading deficiencies, holding that the proper remedy was to grant plaintiffs leave to amend to include additional allegations in their complaint. *A&D*, 748 F.3d at 1158-1159.

## **CONCLUSION**

For the foregoing reasons, Mr. Piszel respectfully requests that the

Court *en banc* rehear this case and vacate the Panel's decision.

Dated:  October 3, 2016                    Respectfully Submitted,
              Washington, D.C.

                                          MURPHY & MCGONIGLE, P.C.


                                          By:  /s/ William E. Donnelly
                                               William E. Donnelly
                                               *wdonnelly@mmlawus.com*
                                               555 13th Street, N.W., Suite 410
                                               Washington, D.C.  20004
                                               (202) 661-7000
                                               James K. Goldfarb
                                               *jgoldfarb@mmlawus.com*
                                               Michael V. Rella
                                               *mrella@mmlawus.com*
                                               1185 Avenue of the Americas
                                               21st Floor
                                               New York, New York  10036
                                               (212) 880-3999
                                               *Attorneys for Plaintiff-Appellant*
                                               *Anthony Piszel*

# ADDENDUM

# United States Court of Appeals
# for the Federal Circuit

———————————————

**ANTHONY PISZEL,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————————

2015-5100

———————————————

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00691-LKG, Judge Lydia Kay Griggsby.

———————————————

Decided: August 18, 2016

———————————————

MICHAEL V. RELLA, Murphy & McGonigle, P.C., New York, NY, argued for plaintiff-appellant. Also represented by JAMES K. GOLDFARB; WILLIAM E. DONNELLY, Washington, DC.

DAVID A. HARRINGTON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

GREGORY P.N. JOSEPH, Joseph Hage Aaronson LLC, New York, NY, for amici curiae Louise Rafter, Josephine Rattien, Stephen Rattien, Pershing Square Capital Management, L.P. Also represented by MARA LEVENTHAL, SANDRA MYNDELLE LIPSMAN, CHRISTOPHER JAMES STANLEY.

REBECCA LEGRAND, LeGrand Law PLLC, Washington, DC, for amicus curiae The National Black Chamber of Commerce.

————————————————

Before DYK, SCHALL, and HUGHES[*], *Circuit Judges.*

DYK, *Circuit Judge.*

Mr. Anthony Piszel appeals from a judgment of the United States Court of Federal Claims ("the Claims Court") dismissing his complaint against the United States for failure to state a claim. That complaint alleged a taking and illegal exaction resulting from a statute and regulations barring the payment of so-called "golden parachute" compensation upon his termination as an employee of the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Because we agree that Mr. Piszel's complaint fails to state a claim on which relief can be granted, we affirm.

BACKGROUND

I

The question here is whether a government prohibition on making golden parachute payments to terminated

————————————————

[*]    Judge Hughes concurs in the judgment and joins all but Part I.A. of the Discussion section.

employees of Freddie Mac constitutes a taking or an illegal exaction.

Mr. Piszel is a former employee of Freddie Mac. According to his complaint, Mr. Piszel began working as the chief financial officer ("CFO") of Freddie Mac in November of 2006. As part of his compensation package, Mr. Piszel was to receive a signing bonus of $5 million in Freddie Mac restricted stock units that would vest over four years, an annual salary of $650,000, and performance-based incentive compensation of roughly $3 million a year in restricted stock. In addition, Mr. Piszel's employment agreement provided that in the event of his termination without cause, Mr. Piszel would receive a lump-sum cash payment of double his annual salary and that certain restricted stock units would continue to vest. These types of termination payments are often referred to as "golden parachute payments." The payments at issue here are alleged to have a value in excess of $7 million.

Freddie Mac is a government sponsored enterprise, meaning that it is a privately owned but publicly chartered financial services corporation created by the United States. *See* 12 U.S.C. § 1452. Pursuant to its charter, Freddie Mac was created to "provide stability in the secondary market for residential mortgages" and "to promote access to mortgage credit throughout the Nation" by "increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." *See* 12 U.S.C. § 1716. As such, Freddie Mac was authorized to purchase and sell residential mortgages from various banks, including "any . . . financial institution the deposits or accounts of which are insured by an agency of the United States." *Id.* § 305(b), 84 Stat. at 454 (codified as amended at 12 U.S.C. § 1454(b)).

At the time that Mr. Piszel accepted his position, Freddie Mac was regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO") pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. *See* Pub. L. No. 102-550, § 1311, 106 Stat. 3672, 3944 (1992). Mr. Piszel alleged in his complaint that his employment contract was reviewed and approved by OFHEO. Mr. Piszel alleged that he performed his job as CFO as a "strong leader" with "excellent performance." J.A. 30–31.

On July 30, 2008, facing great turmoil in the national housing market and the potential collapse of Freddie Mac, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"). Pub. L. No. 110-289, 122 Stat. 2654 (2010) (codified at 12 U.S.C. § 4511 *et seq.*). At the time, Freddie Mac, along with its sister bank the Federal National Mortgage Association ("Fannie Mae"), owned or guaranteed about half of the nation's $12 trillion mortgage market. The act significantly restructured the regulatory framework for Freddie Mac, establishing the Federal Housing Finance Agency ("FHFA") to replace OFHEO as the primary regulator of Freddie Mac. *See* 12 U.S.C. § 4511. In addition, the act significantly clarified and expanded the powers of the FHFA to act as a conservator or receiver for Freddie Mac should the mortgage giant get into serious financial trouble. *See id.* § 4617. As a conservator, the FHFA would "immediately succeed to all rights, titles, powers, and privileges of the regulated entity" and could "take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity." *Id.* § 4617(b)(2). The FHFA as conservator was given the explicit power to "disaffirm or repudiate any contract," after which damages for the breach would be limited to "actual direct compensatory damages." *Id.* § 4617(d)(1).

Additionally, and apart from the powers vested in the conservator to disaffirm contracts, the act contained a limit on "golden parachutes": it authorized the Director of the FHFA to "prohibit or limit, by regulation or order, any golden parachute payment." *Id.* § 4518(e)(1). The statute defined a "golden parachute payment" as "any payment . . . that is contingent on the termination of [a] party's affiliation with [Freddie Mac]" and that is received on or after Freddie Mac is declared insolvent, placed in conservatorship or receivership, or is in financial trouble. *Id.* § 4518(e)(4)(A). The section also provided that "any payment made pursuant to a bona fide deferred compensation plan or arrangement which the Director determines, by regulation or order, to be permissible" is not a "golden parachute payment." *Id.* § 4518(e)(4)(C)(ii).

Congress did not outright prohibit all golden parachute payments,[1] but rather left it to the Director of the FHFA to develop regulations determining which payments should, and should not, be made. Congress provided a number of "factors to be considered by the Director in taking any action" pursuant to his new authority. *Id.* § 4518(e)(2). Specifically, Congress stated that the Director should consider:

> **(A)** whether there is a reasonable basis to believe that the affiliated party has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the regulated entity that has had a material effect on the financial condition of the regulated entity;

---

[1]    Congress did prohibit some severance payments, specifically the prepayment of salary if made "in contemplation of the insolvency of such regulated entity" or "with a view to, or having the result of preventing" the proper distribution of assets to creditors. 12 U.S.C. § 4518(e)(3).

**(B)** whether there is a reasonable basis to believe that the affiliated party is substantially responsible for the insolvency of the regulated entity, the appointment of a conservator or receiver for the regulated entity, or the troubled condition of the regulated entity (as defined in regulations prescribed by the Director);

**(C)** whether there is a reasonable basis to believe that the affiliated party has materially violated any applicable provision of Federal or State law or regulation that has had a material effect on the financial condition of the regulated entity;

**(D)** whether the affiliated party was in a position of managerial or fiduciary responsibility; and

**(E)** the length of time that the party was affiliated with the regulated entity, and the degree to which—

**(i)** the payment reasonably reflects compensation earned over the period of employment; and

**(ii)** the compensation involved represents a reasonable payment for services rendered.

*Id.*

The Director issued regulations implementing the statute on September 16, 2008. *See* 73 Fed. Reg. 53356-01 (2008) (codified at 12 C.F.R. § 1231). These regulations generally prohibited all payments within the statutory definition of "golden parachute payments," but listed several scenarios in which such a payment could be made, for example, when a regulated entity requests to make a payment and can demonstrate that the person involved did not commit any wrongdoing. *See* 12 C.F.R. § 1231.3(b) (2014).

The government placed Freddie Mac into conserva-torship on September 7, 2008, because, according to FHFA's website, there was "substantial deterioration in the housing markets that severely damaged Fannie Mae and Freddie Mac's financial condition and left them unable to fulfill their mission without government inter-vention." J.A. 34. Mr. Piszel alleges the following in his complaint: about two weeks later, on September 22, 2008, the Director of the FHFA, acting in his capacity and under his authority as Freddie Mac's regulator, sent a letter to Freddie Mac's CEO stating that he had "deter-mined that [Mr. Piszel] should be terminated effective close of business today 'without cause.'" *Id.* 35. The letter further provided that Freddie Mac should not pay Mr. Piszel a severance payment nor "any salary beyond the date of the cessation of Mr. Piszel's employment, any annual bonus for 2008 [or] any further vesting of stock grants." *Id.* As alleged, the letter stated that the basis for this decision was the newly-enacted golden parachute section of HERA and the implementing regulations. As a result of the letter, Freddie Mac terminated Mr. Piszel and, according to Mr. Piszel, "refused to provide him with any of the benefits to which he was contractually entitled under his employment agreement, including his $1.3 million termination payment and the remainder of the restricted stock units that were granted to him as a signing bonus and were required to continue vesting after his termination." *Id.* 36.[2]

## II

Mr. Piszel filed suit against the United States on Au-gust 1, 2014, nearly six years after he was fired from his

---

[2]    Mr. Piszel alleges that at the time of his termina-tion, he had only received 19,735 of the 78,940 restricted stock units granted under his employment agreement.

job as CFO of Freddie Mac.  At the time of the filing of his
suit, Mr. Piszel had not filed suit against Freddie Mac for
breach of contract nor, apparently, could he have, as the
statute of limitations on such an action had already run.[3]

In his complaint, Mr. Piszel alleged a taking and an
illegal exaction by the United States.  Mr. Piszel asserted
that:

> The FHFA's actions . . . in directing Freddie Mac
> to terminate Mr. Piszel without cause without
> paying him his contractually-required benefits (or
> any other just compensation), constitute[d] a tak-
> ing in violation of the Fifth Amendment that com-
> pletely deprived Mr. Piszel of his rights in his
> private property interests and rendered those in-
> terests worthless.  Indeed, the Government's ac-
> tions permanently excluded Mr. Piszel from any
> interest in his contractual benefits and destroyed
> Mr. Piszel's right to those interests . . . .

> Alternatively, the Government's actions constitute
> an unlawful exaction in violation of HERA and
> the Due Process Clause of the Fifth Amendment,
> specifically because the government exceeded its
> authority under HERA in prohibiting payments
> that were not "golden parachute payments."

J.A. 39.

---

[3]    Both parties agree that Freddie Mac, as a private
institution, would be the appropriate counterparty in a
breach of contract suit.  *See O'Melveny & Myers v.
F.D.I.C.*, 512 U.S. 79, 85 (1994).  According to both par-
ties, the suit would have been brought in Virginia state
court under Virginia law, which has a five-year statute of
limitations for contract claims.  *See* Va. Code Ann. § 8.01-
246(2) (1977).

The government moved to dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").[4]  This rule is identical to its counterpart rule in the Federal Rules of Civil Procedure.  The government argued that Mr. Piszel had failed to plead facts sufficient to support the various takings and illegal exaction claims.  Mr. Piszel did not move to amend his complaint under RCFC 15 in response to the motion to dismiss, but rather defended the complaint as originally filed.

The Claims Court granted the government's motion to dismiss the categorical and physical takings claims because it concluded that Mr. Piszel "fail[ed] to allege a plausible categorical or physical takings in his complaint." *Piszel v. United States*, 121 Fed. Cl. 793, 805 (2015).  The Claims Court also dismissed Mr. Piszel's regulatory takings claim because it concluded that Mr. Piszel did not have a cognizable Fifth Amendment property interest in his employment agreement and that Mr. Piszel did not have an investment-backed expectation in his employment agreement.  *Id.* at 803, 805–06.  Additionally, the Claims Court dismissed Mr. Piszel's exaction claim because Mr. Piszel "concedes that he has not paid any money to the government" and therefore "there is no way to read the allegations in the complaint to state a plausible illegal exaction claim." *Id.* at 807.

Mr. Piszel appealed.  Following oral argument, we ordered supplemental briefing regarding the regulatory takings claim.  Specifically, we asked the parties to address three questions:

---

[4]     The government also moved to dismiss under Rule 12(b)(1) of the RCFC for identical reasons because the Claims Court would not have jurisdiction if Mr. Piszel could not plausibly state a claim against the United States.  *See* 28 U.S.C. § 1491.

(1) Does the fact that the golden parachute provision, 12 U.S.C. § 4518(e), did not eliminate breach of contract claims preclude a takings action against the government?

(2) Would recovery for such a breach of contract claim be limited by the doctrine of impossibility or the sovereign acts doctrine and would the limitations on damages for breach of contract claims in HERA, 12 U.S.C. § 4617(d)(3)(A), preclude or limit recovery of breach of contract damages? *Compare Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 27 F.3d 598 (D.C. Cir. 1994), *with Howell v. FDIC*, 986 F.2d 569 (1st Cir. 1993).

(3) If these doctrines or statutory provisions would limit recovery, what impact would that have on the existence of a takings claim?

Order for Supplemental Briefing, *Piszel v. United States*, No. 15-5100 (Fed. Cir. Apr. 7, 2016). Supplemental briefs were received from both parties. We have jurisdiction under 28 U.S.C. § 1295(a)(3) from a final decision of the Claims Court. We review the Claims Court's grant of a motion to dismiss *de novo*, assuming the factual allegations of the complaint to be true. *See Kam-Almaz v. United States*, 682 F.3d 1364, 1367–68 (Fed. Cir. 2012).

DISCUSSION

I

We first consider Mr. Piszel's regulatory takings claim. The Supreme Court has explained "that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). A regulatory takings analysis eschews any set formula, but

rather involves an "ad hoc, factual inquir[y]" which involves "several factors that have particular significance." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978). "Primary among [the] factors" for analyzing a regulatory taking is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Lingle*, 544 U.S. at 538–39 (internal quotation marks and citations omitted).

Here, Mr. Piszel alleges that the government effected a taking of his contractual right to payment of severance benefits when, pursuant to the statute and regulations prohibiting payment of golden parachutes, 12 U.S.C. § 4518(e) and 12 C.F.R. § 1231.3, the Director of the FHFA instructed the CEO of Freddie Mac to terminate Mr. Piszel's employment and not to pay him any severance. The government argues that the government's actions did not amount to a taking for several distinct reasons.

## A

The government argues, and the Claims Court found, that Mr. Piszel lacked a cognizable Fifth Amendment property interest. We disagree.

In evaluating whether governmental action constitutes a taking for Fifth Amendment purposes, the court must determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). When a claimant lacks such a property interest, nothing has been taken, and thus the claimant cannot maintain a takings claim. *See Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

In general, "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States,* 292 U.S. 571, 579 (1934); *see U.S. Tr. Co. of N.Y. v. New Jersey,* 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *A & D Auto Sales, Inc. v. United States,* 748 F.3d 1142, 1152 (Fed. Cir. 2014); *see also United States v. Petty Motor Co.,* 327 U.S. 372, 380–81 (1946) (holding that plaintiff was entitled to compensation for government's taking of option to renew a lease). Mr. Piszel's employment contract with Freddie Mac is no exception.

Nonetheless, the government asserts that Mr. Piszel did not have a vested property interest in his contractual rights to severance because Freddie Mac operated in an environment of pervasive federal regulation. The government's theory is that because Mr. Piszel voluntarily contracted with an entity that was subject to pervasive regulation, he assumed the risk of future regulation and thus cannot claim a vested interest in property that was likely to be subject to additional regulation. Because Mr. Piszel voluntarily entered into a highly regulated area, he lacked a right to exclude the government from his property.

To be sure, if a regulation existed at the time of contract formation, the regulation would have inhered in the title. *See A & D,* 748 F.3d at 1152; *Hearts Bluff Game Ranch, Inc. v. United States,* 669 F.3d 1326, 1331 (Fed. Cir. 2012) (holding that the government's precluding plaintiff from building a mitigation bank on his property was not a taking because the government's authority predated plaintiff's property right); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 618 (D.C. Cir. 1992) (rejecting a takings claim because pre-existing regulations allowed for agency discretion relating

to the act alleged to be a taking).  But here there was no
specific regulation prohibiting golden parachute payments
at the time of contract formation.  The regulation, at the
time, provided only for government review of Mr. Piszel's
compensation to determine whether it was "reasonable
and comparable with compensation for employment in
other similar businesses . . . involving similar duties and
responsibilities." 12 U.S.C. § 4518(a).  There is no conten-
tion here that Mr. Piszel's golden parachute was unrea-
sonable under that standard.  "If a challenged restriction
was enacted after the plaintiff's property interest was
acquired, it cannot be said to 'inhere' in the plaintiff's
title." *A & D*, 748 F.3d at 1152.  This is the situation
here.

   The government is nonetheless correct that the back-
ground regulatory environment is relevant to a takings
analysis.  When the government acts in a highly regulat-
ed environment to bolster restrictions or eliminate loop-
holes in an existing regulatory regime, the existence of
government regulation does not defeat a property inter-
est, but is relevant to whether there were investment-
backed expectations under the *Penn Central* test.  *See*
*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers*
*Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993); *Connolly*
*v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 226–27
(1986).  Indeed, in *Concrete Pipe* and *Connolly,* relied
upon by the government for the proposition that Mr.
Piszel lacked a cognizable property interest, the
Supreme Court did not conclude that no property interest
existed.   Rather, the Court concluded that because the
property involved in those cases "had long been subject to
federal regulation," there was no interference with the
plaintiff's reasonable investment-backed expectations
because there was no "reasonable basis to expect" that
Congress would not alter the regulatory scheme.  *Concrete*
*Pipe*, 508 U.S. at 645; *accord Connolly*, 475 U.S. at 226–

27. The same approach is also reflected in our decision in *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992), on which the government additionally relies. *See also Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073–74 (Fed. Cir. 1994).

In short, "there is [] ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment." *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003). In *Cienega Gardens*, we rejected the government's position that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Id.* at 1330 (quoting government brief) (internal quotation marks omitted); *see also A & D*, 748 F.3d at 1152–53 (finding that a property interest in contract rights existed despite being subject to bankruptcy law). We therefore conclude that Mr. Piszel had a cognizable Fifth Amendment property interest in his contract rights.

B

The government argues that Mr. Piszel should be barred from pursuing a takings claim because he failed to pursue a breach of contract claim against Freddie Mac. Mr. Piszel argues that there is no requirement to pursue a breach of contract claim against a private party before bringing a takings claim. We disagree with the government that Mr. Piszel's failure to pursue a contract remedy is an absolute bar to his bringing a takings claim against the government.

The Supreme Court has held that a claimant must exhaust administrative or judicial remedies against the relevant government entity in order for his regulatory takings claim to be ripe. *See, e.g.*, *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473

U.S. 172, 186–87 (1985); *see also, e.g., Palazzolo v. Rhode Island*, 533 U.S. 606, 618–19 (2001); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 735 (1997); *Mac-Donald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348 (1986). The Court has explained that to demonstrate a regulatory taking, a party "must establish that the regulation has in substance 'taken' his property—that is, that the regulation 'goes too far.'" *MacDonald*, 477 U.S. at 348 (citations omitted). But "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Id.* This is because "resolution of [this] question depends, in significant part, upon an analysis of the effect [of the regulation] on the value of [the] property and investment-backed profit expectation. That effect cannot be measured until a final decision is made as to how the regulations will be applied." *Id.* at 349 (quoting *Williamson*, 473 U.S. at 200). As to the second prong of a takings claim, a failure to provide "just compensation," "a court cannot determine whether a municipality has failed to provide 'just compensation' until it knows what, if any, compensation the responsible administrative body intends to provide." *MacDonald*, 477 U.S. at 350.

We have applied a similar concept in cases where a party alleges a taking of a contract with the government. We have held that when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim. As we have explained, "[t]aking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than its sovereign capacity" and therefore the "remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001); *see also Sun Oil Co.*

*v. United States*, 215 Ct. Cl. 716, 770 (Ct. Cl. 1978) (dismissing takings claim where the government was a party—the plaintiff's remedies for the government's violation of its contractual rights "must be directed [at the government] in its proprietary capacity and not in its sovereign capacity").

However, we are aware of no case that mandates that a claimant pursue a remedy against a *private* party before seeking compensation from the government. Indeed, our recent decision in *A & D* is to the contrary. In *A & D*, car dealerships brought takings claims against the government because the government instructed auto manufacturers to breach certain agreements with those dealerships. *A & D*, 748 F.3d at 1147. We addressed the takings claim against the government even though we noted that the claimants may have remaining claims against the auto manufacturers. *Id.* at 1149 ("To the extent the franchises were terminated by action of the bankruptcy estate, the affected dealers received unsecured claims against the estates."). And the Supreme Court has consistently addressed takings claims even though claimants could have pursued breach of contract claims against the private parties. *See, e.g., Armstrong v. United States*, 364 U.S. 40, 41–42 (1960); *Norman v. Balt. & Ohio R.R. Co.*, 294 U.S. 240, 292–94 (1935); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 510–11 (1923). We therefore find no basis for the government's argument that Mr. Piszel had to pursue a breach of contract claim against Freddie Mac before bringing a takings claim, even though, as described below, the existence of a remedy for breach of contract is highly relevant to the takings analysis in this case.

II

A

We next consider whether the complaint sufficiently alleges a taking.  As noted, the complaint simply alleges that the government's instruction to Freddie Mac amounted to a total taking of Mr. Piszel's contractual right:

> The FHFA's actions . . . in directing Freddie Mac to terminate Mr. Piszel without cause without paying him his contractually-required benefits (or any other just compensation), constitute a taking in violation of the Fifth Amendment that completely deprived Mr. Piszel of his rights in his private property interests and rendered those interests worthless.  Indeed, the Government's actions permanently excluded Mr. Piszel from any interest in his contractual benefits and destroyed Mr. Piszel's right to those interests.

J.A. 39.

The government's instruction to Freddie Mac did not take anything from Mr. Piszel because, even after the government's action, Mr. Piszel was left with the right to enforce his contract against Freddie Mac in a breach of contract action.  As the government correctly points out, "the only duty a contract imposes is to perform or pay damages."  *F.T.C. v. Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir. 2002) (citing Oliver Wendell Holmes, Jr., *The Common Law* 300–02 (1881)).  Thus, to effect a taking of a contractual right when performance has been prevented, the government must substantially take away the right to damages in the event of a breach.  *See Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002) (finding that because "the plaintiffs retained the full range of remedies associated with any contractual proper-

ty right they possessed[,]" the government action "did not constitute a taking of the contract").

There can be no doubt that the golden parachute provision of HERA did not take away Mr. Piszel's ability to seek compensation for breach of his employment contract in a traditional breach of contract suit under state contract law. Indeed, at oral argument, Mr. Piszel agreed "that the golden parachute provision didn't eliminate [Mr. Piszel's] breach of contract claim," and the government agreed. Oral Argument at 2:40; *see also id.* at 17:29; Gov't Supp. Br. at 3–4; Piszel Supp. Br. at 1.

Nothing in the statute or regulations removes Mr. Piszel's ability to pursue a breach of contract remedy against his employer. Neither the golden parachute provision nor the regulations make any mention of a breach of contract claim. *See* 12 U.S.C. § 4518; 12 C.F.R. § 1231.3.

Other similar provisions of HERA indicate that when a conservator prohibits performance of a contract, an action for breach of contract remains. Section 1367(b)(2)(H) of HERA states a general policy that the conservator "shall, to the extent of proceeds realized from the performance of contracts or sale of the assets of a regulated entity, pay all valid obligations of the regulated entity that are due and payable at the time of the appointment" of the conservator. 122 Stat. at 2738 (codified at 12 U.S.C. § 4617(b)(2)(H)). Section 1367(b)(19)(d), like the golden parachute provision, allows the conservator to "disaffirm or repudiate" contracts including "any contract for services between any person and any regulated entity" like employment contracts. 122 Stat. at 2747–48, 2750 (codified at 12 U.S.C. § 4617(b)(19)(d)). That section plainly preserves a breach of contract claim, providing that the conservator will be liable for the disaffirmance or repudiation of the contract but limits the liability to

"actual direct compensatory damages." *Id.*; *see also Howell v. F.D.I.C.*, 986 F.2d 569, 571 (1st Cir. 1993) ("By repudiating the contract the receiver is freed from having to comply with the contract . . . but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages."). The statute cannot reasonably be read to preserve a breach claim when the conservator disclaims a contract providing for a payment but to eliminate a breach claim when the identical action is taken pursuant to a regulatory directive. Thus, the surrounding provisions indicate that Congress intended to preserve breach of contract claims, as the parties agree.

B

On appeal, Mr. Piszel argues that even if his breach claim is preserved, it is of little value because such a breach claim would be subject to an impossibility defense. The complaint makes no such allegation, and there is no basis for such an assumption.

"The Supreme Court . . . has made clear that in the regulatory takings context the loss in value of the adversely affected property interest cannot be considered in isolation." *Cienega Gardens*, 503 F.3d at 1280. Rather, the "test for regulatory taking requires [a court] to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987); *see also Concrete Pipe*, 508 U.S. at 644; *Cienega Gardens*, 503 F.3d at 1281. The Supreme Court recognized this in the very case that created the regulatory takings framework, explaining that "[i]n deciding whether a particular governmental action has effected a taking, this Court focuses . . . on the character of the action and *on the nature and extent of the interference with rights in the parcel as a whole.*" *Penn Cent.*, 438 U.S. at 130–31 (emphasis added). This is, of course, because "a regulato-

ry taking does not occur unless there are serious financial consequences" that stem from the government action. *Cienega Gardens*, 503 F.3d at 1282.

Mr. Piszel asserts in his briefs, but not in his complaint, that pursuing his breach of contract claim against Freddie Mac would have been futile because "[t]he doctrine of impossibility would preclude Mr. Piszel's recovery for a breach of contract claim against Freddie Mac." Piszel Supp. Br. at 11.[5]  In other words, Mr. Piszel argues that because the government's actions created an impossibility defense for the private party he may have sued, the government effected a taking of his property or, at least, caused severe adverse financial consequences.  It is unclear whether a government action that creates a state-law impossibility defense amounts to an act that would support a takings claim.  *See, e.g., Omnia*, 261 U.S. at 511 (finding no takings claim even though the Supreme Court recognized that "[a]s a result of [the] governmental action the performance of the contract was rendered impossible").  But even assuming without deciding that the indirect creation of an impossibility defense could support a takings claim, Mr. Piszel's breach of contract claim may well have survived an impossibility defense, and his complaint does not allege otherwise.

First, an impossibility defense would have been unlikely to succeed if the statute and regulations did not bar the payments.[6]  Mr. Piszel could have sought to prove,

---

[5]    Impossibility, or impracticability, is an affirmative defense against a breach of contract claim which excuses non-performance in certain situations.  *See, e.g.*, Restatement (Second) of Contracts § 261 (1981).

[6]    While we do not reach the issue here, we have also held that "[a] compensable taking arises only if the government action in question is authorized."  *Del-Rio*

and does in fact allege in his complaint, that the termination of his payments was not authorized by the statute. J.A. 39–40 ("[T]he government exceeded and contravened its statutory and regulatory authority under HERA" in withholding payments which were "explicitly excluded from the definition of 'golden parachute payment.'"). Under the statute, the only payments that are prohibited are "golden parachute payments," meaning payments that are "contingent on the termination of [a] party's affiliation with the regulated entity." 12 U.S.C. § 4518(e)(4)(A)(i). Congress explicitly stated that payments "made pursuant to a bona fide deferred compensation plan" are not "golden parachute payments," 12 U.S.C. § 4518(e)(4)(C)(ii), and the regulations include in that definition agreements where a party "voluntarily elects to defer all or a portion of the reasonable compensation, wages, or fees paid for services rendered," 12 C.F.R. § 1231.2.

Mr. Piszel alleges that the payments he was to receive "fit[] squarely into [the] exclusion," Piszel Opening Br. at 54, because "they were payments 'made pursuant to a bona fide deferred compensation plan or arrangement[,]' which are excluded from the definition of 'golden parachute payment.'" J.A. 37. Plaintiffs have brought, and courts have considered, breach claims that particular payments do not qualify as "golden parachute payments" in similar situations. *See, e.g.*, *Solsby v. Plaza Bank*, No. G049272, 2015 WL 668711, at *6 (Cal. Ct. App. Feb. 17, 2015) (addressing the question of "whether . . . severance compensation qualified as a[] . . . 'golden parachute'"); *Cross-McKinley v. F.D.I.C.*, No. CV 211-172, 2013 WL 870309, at *4 (S.D. Ga. Mar. 7, 2013) (same); *Faigin v. Signature Grp. Holdings, Inc.*, 150 Cal. Rptr. 3d 123, 139

_____

*Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998).

(Cal. Ct. App. 2012) (same); *Hill v. Commerce Bancorp, Inc.*, No. 09-3685 RBK/JS, 2012 WL 694639, at *7 (D.N.J. Mar. 1, 2012) (same). Mr. Piszel offers no reason why the courts could not have addressed his breach claim, had he sought to prove it.

Second, an impossibility defense is not available if the breaching party could have secured permission to perform under the agreement. Under the regulations, a regulated entity may make a golden parachute payment if it requests to do so and "demonstrate[s] that it does not possess and is not aware of any information . . . that would indicate that there is a reasonable basis to believe" that the party to whom the payment is made has committed any wrongdoing that would be likely to have a "material adverse effect" on the regulated entity, is "substantially responsible for the . . . troubled condition of the regulated entity," "has materially violated any applicable Federal or State law or regulation that has had or is likely to have a material effect on the regulated entity," or has violated various sections of federal law relating to fraud and corruption. 12 C.F.R. § 1231.3(b)(1)(iv); *see also, e.g.*, *WMI Liquidating Tr. v. F.D.I.C.*, 110 F. Supp. 3d 44, 54 (D.D.C. 2015) (reviewing and remanding a determination by the Federal Deposit Insurance Corporation ("FDIC") as to a request to pay a golden parachute payment under identical regulations).

In his complaint, Mr. Piszel alleged that "no court, regulator, or government agency has found that Mr. Piszel committed any wrongdoing or violated any law while at Freddie Mac, or that Mr. Piszel was otherwise responsible for Freddie Mac's financial condition or the conservatorship." J.A. 37. The complaint also notes that "the FHFA publicly acknowledged that it investigated but uncovered no evidence sufficient to demonstrate that any of Freddie Mac's current or former officers or directors engaged in" wrongdoing. *Id.* 38 (internal quotation marks

omitted). Thus, Mr. Piszel's complaint itself suggests that Freddie Mac could have received the required permission to make the payments. The complaint, however, makes no allegation that Freddie Mac sought, or that the FHFA denied, permission to make the necessary payments.

In *Hill*, under nearly identical FDIC regulations, the district court denied a bank defendant summary judgment based on an impossibility defense when a former executive sued for breach of his employment contract after his former employer failed to pay his severance. *See* 2012 WL 694639, at *10. The employer asserted an impossibility defense based on an analogous FDIC prohibition on golden-parachute payments. *See id.* However, the district court held that the employee could pursue a theory that the employer's failure to request permission, as allowed under the regulations, constituted a breach of the agreement calling for severance payments. *See id.*, at *9 ("[T]he question of whether Defendants are able to make the requisite certification for the [] exception is central to the question of whether or not Defendants can be said to have breached the Agreement by withholding Mr. Hill's severance payment."). Thus, because "there remain[ed] a genuine question of material fact as to whether or not Defendants are able to make the . . . certification[s] [necessary to apply for an exception], Defendants cannot be afforded summary judgment on their contractual impossibility defense." *Id.* If the employer could but did not, it would be liable for breach notwithstanding the regulations prohibiting golden parachutes. Here also there remained the possibility that Freddie Mac could have secured permission to make the payments.[7]

_____

[7] There is also the possibility that Mr. Piszel himself could have requested permission to receive the pay-

Third, it is not clear as to whether the impossibility defense would apply at all even if the payments were prohibited. An impossibility defense could be defeated by showing that the contracting party assumed the risk of government regulation. The Restatement (Second) of Contracts § 264 states that "[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 264. However, the comments note that "[w]ith the trend toward greater governmental regulation, however, parties are

---

ment. The FHFA notice proposing the golden parachute regulations provided little explanation on this point. *See* 73 Fed. Reg. 53356-01 (Sept. 16, 2008); 12 C.F.R. § 1231. However, notably, in a notice announcing nearly identical regulations resulting from a nearly identical provision of title 12 governing the FDIC's regulation of financial institutions, the FDIC stated that under the regulations an "employee who feels that he/she is being unfairly affected by the rule could apply for permission to receive a payment" as well. Regulation of Golden Parachutes and Other Benefits Which May Be Subject to Misuse, 60 Fed. Reg. 16069-01, 16074 (Mar. 29, 1995) (codified at 12 C.F.R. § 359.4); *see also Hill*, 2012 WL 694639, at *7 (noting that both the bank and the affected party are "equally eligible to apply for the exception to the golden parachute restrictions"). There is no indication in the complaint or the briefs that Mr. Piszel made a request to the FHFA to allow Freddie Mac to pay for any or all of his severance benefits. However, we need not decide this issue, which has not been identified by either party, because (as discussed), Mr. Piszel's complaint fails for other, independent reasons.

increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions." *Id. cmt. a; see also United States v. Winstar Corp.*, 518 U.S. 839, 868–69 (1996) (reading a contract promise there "as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's non-occurrence. . . . Contracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows."). Certainly Freddie Mac operated in a regulated environment where a court may have concluded that Freddie Mac accepted the risk of regulatory action. In a breach action, the courts might have concluded that Freddie Mac bore the risk of regulatory intervention, thus depriving it of an impossibility defense.[8]

## C

Under the circumstances, Mr. Piszel has failed to allege facts that would allow us to conclude that the government's actions substantially affected his contractual property right. He agrees that his breach claim survived.

---

[8]    As noted, we asked the parties to address whether recovery for a breach of contract claim would be limited by the sovereign acts doctrine. Both Mr. Piszel and the government take the position that the sovereign acts doctrine would not limit recovery in this case. Gov't Supp. Br. at 6–7; Piszel Supp. Br. at 12 n.10. We agree. We also agree with the parties that HERA's limitations on damages for breach of contract claims, 12 U.S.C. § 4617(d)(3)(A), would not affect Mr. Piszel's recovery in a breach of contract action against Freddie Mac. *See* Gov't Supp. Br. at 8–9; Piszel Supp. Br. at 12 n.10.

In his complaint, Mr. Piszel does not allege that the government action created an impossibility defense. Indeed, to some extent his complaint alleges to the contrary, stating the FHFA's instruction to Freddie Mac was invalid because his payment was not a "golden parachute" payment but rather deferred compensation exempt from the golden parachute provision (removing an impossibility defense), and that he did not engage in wrongdoing (thereby permitting Freddie Mac to request permission to make his severance payments). In other respects as well it appears possible that the right to enforce the terms of the contract may have been left substantially intact after the government's actions.[9] We affirm the Claims Court's dismissal of Mr. Piszel's regulatory takings claim.

### III

We now address Mr. Piszel's remaining claims, which we conclude are without merit.

Mr. Piszel alleges that the government's actions amount to a per se or a categorical taking. Supreme Court precedent carves out two categories of regulatory action that constitute "per se" takings under the Fifth Amendment. "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle*, 544 U.S. at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)

---

[9] We note that in *A & D*, the plaintiff had a theoretical claim against the bankruptcy estate, but as the government conceded, "there [was] no question that [the plaintiffs] have alleged that their [franchises] have no value" after the government action. *A & D Auto Sales, Inc. v. United States*, Nos. 13-5019, 13-5020, Oral Argument at 3:50–4:00.

(state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking)). Here, none of Mr. Piszel's property suffered permanent physical invasion. "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial use' of her property." *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Even if the *Lucas* line of cases applies to intangible property like contract rights,[10] as we have discussed above, the government's actions did not amount to a total taking of Mr. Piszel's property because the government's actions left intact his potential breach of contract claim against Freddie Mac.

Mr. Piszel also alleges that the government's actions amounted to an illegal exaction. "[A]n illegal exaction claim may be maintained when the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from [him] in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996) (internal quotation marks and citations omitted). Mr. Piszel does not allege that he paid any money to the government. Rather, his theory is that because the government (as conservator) caused Freddie Mac not to pay him his severance payments, his not receiving severance was in essence a payment sufficient to amount to an illegal exaction.[11] Even assuming that an illegal exaction

---

[10]    As we noted in *A & D*, "[w]e have not had occasion to address whether the categorical takings test applies to takings of intangible property such as contract rights," 748 F.3d at 1151–52, and we need not do so here.

[11]    On appeal, Mr. Piszel also argues that HERA is money mandating. Mr. Piszel failed to plead such a

claim can involve payments to non-governmental entities, there was no exaction here because there was no payment. *See Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (2002) (no illegal exaction where money is "prevented from coming into [a] plaintiff's account"). Illegal exaction concerns the "recovery of monies that the government has required to be paid contrary to law." *Aerolineas*, 77 F.3d at 1572.   No facts as alleged in the complaint concern the payment of money by Mr. Piszel; thus, Mr. Piszel's illegal exaction claim must also fail.

We affirm the dismissal of Mr. Piszel's claims.

## AFFIRMED

### COSTS

Costs to the government.

---

claim.   *See* J.A. 38–40.   In any case, there is no basis for such an assertion.

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2016, I electronically filed with the Clerk's Office of the U.S. Court of Appeals for the Federal Circuit this Petition for rehearing *en banc*, and further certify that the parties' counsel will be notified of, and receive, this filing through the Notice of Docket Activity generated by this electronic filing.


/s/ William E. Donnelly